Jeffries and Jeffries (freedmen) v. The State.

---

## JEFFRIES AND JEFFRIES (FREEDMEN) *vs.* THE STATE.

[INDICTMENT FOR LARCENY OF MULE.]

1. *Sufficiency of indictment in description of defendant.*—In an indictment which was found in October, 1865, which describes the defendants as *freedmen,* and which alleges that the offense was committed by them before the finding of the indictment, it is not necessary to aver whether they were freedmen or slaves at the time the offense was committed.

2. *Judicial notice of general orders for regulation of army.*—This court will take judicial notice of "General Orders, No. 100," approved by the president of the United States on the 24th April, 1863, which dis-

penses with a proclamation of martial law in any place occupied by an invading army of the United States, and declares all local laws suspended by the presence of the occupying army.

3. *Suspension of State laws between 20th July and 21st September,* 1865.— Between the 20th day of July, 1865, when the provisional governor of Alabama issued a proclamation, declaring the civil and criminal laws of the State, "as they stood on the 11th day of January, 1861, except that portion which relates to slavery, to be in full force and operation"; and the 21st day of September, 1865, when the State convention, called by the provisional governor, adopted an ordinance, ratifying, with certain specified exceptions, all the laws enacted by the legislature subsequent to the 11th day of January, 1861, the laws enacted by the legislature subsequent to the 11th day of January, 1861, were not in force. (WALKER, C. J., *dissenting.*)

4. *Punishment for larceny of mule.*—For the larceny of a mule at any time between the 20th July and the 21st September, 1865, a conviction can not be had under the act approved October 7th, 1864, (Session Acts, 1864, p. 19,) but may be had under section 3180 of the Code. (WALKER, C. J., *dissenting.*)

FROM the Circuit Court of Greene.
Tried before the Hon. JAMES COBBS.

THE indictment in this case, which was returned into court on the 19th October, 1865, charged that, "before the finding of this indictment, Washington Jeffries and Lafayette Jeffries, freedmen, feloniously took and carried away two mules, the personal property of John W. Walton; against the peace and dignity," &c. The defendants moved to quash the indictment, and also demurred to it, assigning as grounds of demurrer—"1st, that the defendants are described as '*freedmen*,'—a term generally understood to mean persons of color, who were slaves before the abolition of slavery in Alabama; and the indictment does not show whether the offense charged was committed by them while slaves, or after they became free"; "2d, that the indictment should have shown that, at the time of the commission of the offense charged, the defendants were free negroes." The court overruled the demurrer, and the defendants then pleaded not guilty.

"On the trial," at the October term, 1865, as the bill of exceptions states, "the State introduced evidence tending to show, that the defendants feloniously took and carried away the mules mentioned in the indictment, belonging to

John W. Walton, on the 28th August, 1865; and there was, also, evidence tending to prove that the defendants, who are negroes, were slaves prior and up to the time of the general abolition of slavery in Alabama. This was all the evidence in the case, and no point was raised as to the commission of the act. The court charged the jury, among other things, that if they believed from the evidence, beyond a reasonable doubt, that the defendants, before the finding of the indictment, and in the county of Greene, feloniously took and carried away the mules mentioned in the indictment, and that they were the property of John W. Walton, they were guilty as charged; and that if they found the defendants guilty, they should say, by their verdict, whether they should suffer death by hanging, or be imprisoned in the penitentiary for a term of years not less than ten. The defendants excepted to this charge, and requested the court to instruct the jury as follows: 'If the jury believe, from the evidence, that the offense charged in the indictment was committed by them prior to the adoption by the late State convention of the ordinance reviving and ratifying, among other acts, the act approved 7th October, 1864, (Session Acts of 1864, p. 19,) and that the defendants were slaves before the institution of slavery was abolished in Alabama, then the defendants can not be convicted under an indictment framed upon said statute, or subjected to the penalties prescribed by it; and that if the jury believe, from the evidence, that the offense charged in the indictment was committed by the defendants before the adoption by the late State convention of the ordinance abolishing slavery in this State, and that said defendants were slaves before the institution of slavery was abolished in this State, they can not be convicted and punished under said act of the 7th October, 1864.' The court refused each of these charges, and the defendants excepted to their refusal."

The jury returned a verdict of guilty, and affixed the punishment at ten years imprisonment in the penitentiary; and the court rendered judgment according to the verdict.

E. MORGAN, and GEO. GOLDTHWAITE, Jr., for the prisoners.
JOHN W. A. SANFORD, Attorney-General, *contra*.

Jeffries and Jeffries (freedmen) v. The State.

BYRD, J.—[1.] The indictment is in substantial conformity to the forms given in the Code, and the rules prescribed therein.—Chapter 7, title 2, part 4. The term *"freedmen"* is descriptive of the *status* of the defendants, and does not vitiate the indictment. It has a legal signification.—*Vide* Ordinance No. 39, adopted September 29, 1865; 1 Bouvier's Law Dictionary, 548. If, on the trial, it had appeared in evidence, or by law, that they were slaves, and not freedmen, if an available variance, it could have been taken advantage of, by asking an appropriate charge. But the view we take of this case relieves us from expressing any further opinion upon this question, at this time. The court properly refused to quash the indictment, and overruled the demurrer.

[2.] The act approved October 7, 1864, was not in force between the 20th July, 1865, and the 21st day of September thereafter. It is apparent from the record, that the defendants were tried and sentenced under the provisions of this act. This State, on the 11th day of January, 1861, in a convention of her people, adopted an ordinance withdrawing "from the union known as the United States of America," and repudiated all allegiance to the national government; and, in confederation with other states of that union, maintained by force of arms this ordinance until May, 1865, when her territory was taken possession of by the military power of the United States, and martial law thereby declared under the "instructions for the government of armies of the United States in the field."—*Vide* General Orders, No. 100, approved by the president April 24, 1863, which declare, that "a place, district, or country, occupied by an enemy, stands in consequence of the occupation under the martial law of the invading or occupying army, whether any proclamation declaring martial law, or any public warning to the inhabitants, has been issued or not. Martial law is the immediate and direct effect and consequence of occupation or conquest. The presence of a hostile army proclaims its martial law." "Martial law, in a hostile country, consists in the suspension, by the occupying military authority, of the criminal and civil law, and of the domestic administration and government in the occupied place or

territory, and in the substitution of military rule and force for the same, as well as in the dictation of general laws as far as military necessity requires this suspension, substitution, or dictation. The commander of the forces may proclaim that the administration of all civil and penal laws shall continue, either in whole or in part, as in times of peace, unless otherwise ordered by the military authority." Of this order we are bound to take judicial notice.—*Ex parte Hill*, 38 Ala. 438.

Under the provisions of this order, the act of the 7th October, 1864, was suspended by the occupation of the State by the United States army, and the surrender of General Taylor, in May, 1865. This occupation and declaration were accompanied by an adequate military force to sustain and enforce them; and thereby subjected the State, and the citizens thereof, to the *status* of a conquered country, in which the will of the conqueror becomes the law of the land, regulated and restrained by the principles and institutes of international law.—*Vide* Vattel, pp. 426, 427; also, book iii, ch. 13; *United States v. Howard*, 2 Gal. 485; *Thirty Hogsheads of Sugar v. Boyle*, 9 Cranch, 191; *Strother v. Lucas*, 12 Peters, 412, and cases therein cited; *Canal Appraisers v. The People*, 17 Wendell, 171; 20 How. 176.

The president of the United States, in June, 1865, as commander-in-chief of the army and navy, appointed Lewis E. Parsons provisional governor of the State; who, on the 20th day of July, 1865, issued a proclamation, by which he declared and ordained, among other things, that, "from and after this date, the civil and criminal laws of Alabama, as they stood on the 11th January, 1861, except that portion which relates to slavery, are hereby declared to be in full force and operation, and all the proceedings for the punishment of offenses against them will be turned over to the proper civil officers, together with the custody of the person charged; and the civil authorities will proceed in all cases according to law." This declaration very clearly, by implication at least, excludes the idea, that the laws enacted after the 11th January, 1861, by the State legislature, were to be in force after the date of the proclamation; and this, upon the familiar maxim, *expressio unius est exclusio alterius*.

And this declaration is recognized as binding on this court, as the United States Government has never disavowed it.

This position is confirmed by the action of the late State convention, which was called and organized under the same authority. That organic body recognized in its ordinances the appointment and authority of the provisional governor of Alabama, and continued him in office, and made provision for the payment of his salary and the officers appointed by him.— *Vide* Ordinances, Nos. 4, 16, 24, 28, 32, 33, 34, 37, 45, 48, 50, 51, and 52.

To strengthen and fortify the position taken in this case, we consider it proper to refer to the views which the State convention seems apparently to have taken upon the subject of the validity and operation of the laws enacted subsequent to the 11th January, 1861, after the occupation of the State by the national forces; and we do this without committing ourselves to the correctness of the conclusions to which the convention seems to have come as to their validity before the occupation. The convention, by ordinance No. 5, provides, that " all laws enacted since the 11th day of January, 1861, which had not been repealed, and which were not in conflict with the constitution of the United States, or laws made in pursuance thereof, or with the constitution of the State, were ratified and declared to be valid from their respective dates, and shall remain in full force and effect, until repealed according to law," excepting certain laws therein specified. The adoption of ordinance No. 26 is persuasive to show in what light the convention looked upon the acts of public officers of this State, and " all judgments, orders, and decrees, of the several courts of this State, regular upon their face, had, done, and performed, or ordered to be done, under color of law, and in pursuance thereof; and all acts and sales of executors, administrators, trustees, and guardians, and of judicial and ministerial officers, had, done, and performed, and made in pursuance of and under color of law, and in good faith, since the 11th of January, 1861," which were not in conflict with the constitution of this State or the United States. These, and others, are evidently ordinances of repose, and should be liberally construed to effectuate

the purposes and objects thereof; and by giving them a construction which would relieve persons from the penalties of the criminal law, and hold them bound by their contracts, will not be inconsistent with, or violative of the policy and spirit of those ordinances; for such a construction is in harmony with the repose intended to be secured.

If the convention had entertained the opinion, that all laws passed by the legislature subsequent to the 11th day of January, 1861, were valid, it would have been unnecessary to have ratified them; unless it were of the opinion that those laws had been suspended by virtue of the occupation of the territory of the State by the national forces, or the proclamation of the provisional governor; and in either, or both cases, it would have been legitimate, and eminently appropriate, for the convention to have given so many of those laws vitality and validity as it saw proper in its wisdom to do. But, in doing so, it could not impart to them any operative effect, so as to make any one liable to the infliction of the punishments provided by such laws, for an offense committed during their suspension. It would be doing violence to the ordinance to give it such a construction; and such as was never intended by the convention. If so, it would have been in violation of the constitution of the United States; and statutes and ordinances should be so construed, as never to make the intention of the makers conflict with the organic law. To give these ordinances an *ex-post-facto* operation as to crimes, would be unconstitutional.—See Bill of Rights, §§ 8, 24; *Bloodgood v. Camack*, 5 Stew. & Porter, 276; 1 Kent's Com. 455.

If such laws, or any of them, were in conflict with the constitution of the State, or of the United States, they were invalid, and, as against the constitution of the United States, could not have been ratified by the convention, so as to have imparted any validity to them; nor does the ordinance attempt to do so. Such laws as were ratified, were in consonance with both constitutions; and if they were in force prior to, or at the date of the surrender and occupation, there is another theory upon which it might be conceived that the convention acted; and that is, that the stern and inexorable logic of events had reduced

the State and its citizens to the *status* of a conquered sovereignty within the limits of a superior sovereignty, against which the subordinate had sought and failed to set up a permanent independent government, and by such failure had become subjected to the rules and principles of law applicable to all sovereignties in a similar condition; that is, to such rules and principles of national and international law as are applicable to the conquest of an independent sovereignty, and to a dependent or subordinate sovereignty, which, in an effort to withdraw from, and repudiate its allegiance to the national government, had been overpowered, and reduced to submission. In the former case, the will of the conqueror becomes the law of the conquered; and in the latter, it may be insisted that the laws of the subordinate sovereignty become void, unless ratified or sanctioned by the national authority; and which has been done, to a certain extent, by the convention, which was organized and held under the direct authority and sanction of the executive and administrative head of the Federal government. But, to adopt this theory, would be harsh, and not consistent with the declarations of, and principles announced by, the executive department of the government: and therefore, we prefer to construe the action of the convention on the theory first considered and adopted.

If there is any other sound and consistent theory, which can solve the difficult questions arising out of the action of the convention, and our peculiar and complex system of State and National sovereignties, and our present condition, it has not yet occurred to us. Neither the ordinances of the convention, nor the proclamation of the provisional governor, is an express abrogation or repudiation of the validity of the laws passed subsequent to the 11th January, 1861. But we are satisfied the effect of the latter was, on the doctrine of implication, *at least*, to suspend their operation from the 20th day of July, 1865, to the 21st day of September thereafter; such is the clear legal result.

The people, looking at the proclamation, would very naturally and properly come to the conclusion, that the act of the 7th October, 1864, was not in force during the time indicated; and it would be unjust and illegal to visit the

Jeffries and Jeffries (freedmen) v. The State.

severe penalties of that law, upon an offense committed during that period; especially, when there was a law in force, and put in force, too, by the proclamation, under which another and a statutory punishment can be inflicted, if the defendants shall be found guilty on another trial.

We are of opinion, that the defendants were free persons of color at the time the offense was committed, as shown in the bill of exceptions.—See *Smith (a freedman) v. The State*, decided at this term. The Code (§ 3180) makes provision for such offenses by such persons. The indictment in this case is good, and the defendants could have properly been convicted under it, if the offense charged had been committed after the 20th of July, 1865, and before the finding of the indictment.

We hold, that the ratification of the act of October 7th, 1864, on the 21st September, 1865, does not repeal section 3180 of the Code; and that both statutes are in force,—the first, as to offenses committed since the 21st September last, and the Code as to offenses committed prior to that time and subsequent to the proclamation. Whether both are in force now, as to the offenses described in the act of 1864, as it is not raised by the record, nor can have any influence on this case, if the evidence is set out correctly in the record, we intimate no opinion; nor can the other questions so ably discussed in the written argument submitted by appellants' counsel, and not settled by this opinion, likely have any influence over this case on another trial.

The court erred in the charge given, and in the sentence pronounced. Let the cause be reversed, and remanded for further proceedings in conformity to this opinion; and the defendants will be retained in custody by the sheriff, until discharged by due course of law.

WALKER, C. J., concurs in this opinion, upon the motion to quash the indictment, and the demurrer thereto, and dissents from the opinion of the court on the other questions adjudicated therein.