## WINTER ET AL. *vs.* DICKERSON ET AL.

[BILL IN EQUITY TO ENJOIN SALE OF REAL ESTATE UNDER EXECUTIONS.]

1. *Suspension of State laws between 20th July and 21st September, 1865.*
The laws enacted by the legislature subsequent to the 11th day of Jan-
uary, 1861, were not in force between the 20th day of July, 1865,
when the provisional governor of Alabama issued a proclamation
declaring the civil and criminal laws of the State, "as they stood on
the 11th day of January, 1861, except that portion which relates to
slavery, to be in full force and operation," and the 21st day of Sep-
tember, 1865, when the State convention, called by the provisional
governor, adopted an ordinance, ratifying, with certain specified excep-
tions, all the laws enacted by the legislature subsequent to the 11th
day of January, 1861.—(*Reaffirming Jeffries and Jeffries v. State,* 39 Ala.
Rep. 655.)

2. *Ordinance 21st September, 1865, restored said laws and liens dependent
on them.*—By the adoption of said ordinance on the 21st day of Sep-
tember, 1865, all the laws enacted by the legislature subsequent to the
11th day of January, with certain specified exceptions, were ratified,
and such laws thus ratified, and *the liens* dependent on them, were re-
invigorated, so that they could be enforced thereafter, as they could
have been before their suspension, by the provisional military governor.

APPEAL from Chancery Court of Montgomery.
Heard before Hon. N. W. COCKE.

THE bill in this cause was filed by James L. Winter and
Charles W. Winter, on the 15th August, 1866, and sought
to enjoin certain judgment creditors of one James R.
Dickerson, from selling a certain lot and store in the city
of Montgomery, Alabama, under sundry executions issued
on judgments recovered by said creditors against James
R. Dickerson. John W. Hughes, James E. Bransdorf,
Michael Baschall, John M. Smith, Josiah Morris, Isham
B. Stubbs, James Fountain, and James Abbott, judgment
creditors, and James R. Dickerson, were made defendants
to the bill.

The following statement will show in a condensed form
the names of the judgment creditors, the dates of the

rendition of the judgments, and the executions and levies thereon :

1. John W. Hughes. Judgment 1 March, 1861. Execution 25 March, 1861. Affirmed January term, supreme court, 1862. 1 September, 1862, satisfied as to interest and costs—stayed as to principal. Execution 10 March, 1866, levied on the premises; 14 July, 1866, execution &c., levied on premises.

2. James E. Bransdorf. Judgment 7 March, 1861. Execution 25 March, 1861, stayed, &c. Execution 2 March, 1866, levied 10 March, 1866. Execution 2 July, 1866, delivered to sheriff 5 July, 1866, levied 10 July, '66.

3. Michael Barschall, judgment 4 September, 1861. Execution 11 September, 1861 ; returned 4 February, 1862, costs and interest paid—stayed as to principal. Execution 26 February, 1866, levied 10 March, 1866. Execution 30 July, 1866, and levy.

4. John M. Smith. Judgment 4 September, 1861. Execution 11 September, 1861 ; returned, cost and interest paid—stayed as to principal. Execution 2 March, 1866, levied 10 March, 1866. Execution 2 July, 1866, delivered 5 July, 1866, and levied.

5. Isham B. Stubbs, Josiah Morris. Jugdment 4 September, 1861. Execution 11 September, 1861 ; returned 4 February, 1862, interest and cost paid—stayed as to principal. Credited 20 June, 1863. Execution 26 February, 1866 ; returned, stayed by suggestion, cost paid. Execution 30 July, 1866, levy, &c., transferred by Morris to Stubbs.

6. James Fountain and James Abbott. Judgment 2 September, 1861. Execution 11 September, 1861 ; returned 2 February, 1862, interest and cost paid—stayed as to principal. Execution 2 March, 1866, levy 10 March 1866. Execution 1 August, 1866, levy, &c.

The lot and store levied on as the property of James R. Dickerson was conveyed to Luther H. Dickerson, and the said James R. Dickerson, by a deed of conveyance executed to them on the 26th March, 1859, by Samuel Murrell, Jackson Harrison and his wife. On the 21st March, 1863,

for a valuable consideration, Luther H. Dickerson conveyed by deed, his interest and title in and to said lot and store, to James R. Dickerson; and on the 1st April, 1863, James R. Dickerson conveyed by deed the said lot and store to Paul Marks and B. R. Jones, jr., for the sum of twenty thousand dollars, which deed was recorded on the 1st April, 1863. On the 21st March, 1864, said Paul Marks and B. R. Jones, jr., conveyed said lot and store to the complainants for the sum of fifty-five thousand dollars, who immediately went into the possession of the same. The complainants averred in the bill that they "had no knowledge or information of the existence of any of said judgments, at the time of said purchase of said lot and store; but, on the contrary, were informed that there were no liens upon said lot and store, and that the title was unencumbered; nor had they " any notice of the existence of said judgments, at the time of their said purchase." The prayer of the bill was that said judgments be decreed to have no lien upon said lot and store; that the injunction be made perpetual, and for general relief. The cause was submitted on a motion by the defendants to dismiss the bill for want of equity. The chancellor granted this motion; and from this ruling the complainants appealed and assigned the same as error.

STONE, CLOPTON & CLANTON, for appellants.

MARTIN & SAYRE, contra.

A. J. WALKER, C. J.—Judgments were rendered in 1861 against James R. Dickerson, by a court of record, in Montgomery county. Upon these judgments executions issued in 1861, but none of them remained in the sheriff's hands later than February, 1862. Executions were again issued upon those judgments in February and March, 1866. There was, therefore, an interval from February, 1862, to February, 1866, without execution upon any of the judgments. On the 21st March, 1863, the defendant in the judgments, James R. Dickerson, became the owner in fee for a valuable consideration of the lands in question. On the first day of April, 1863, Dickerson conveyed in fee, for a valuable consideration, to Paul Marks and Benjamin

R. Jones, jr., who, on the the 21st March, 1864, conveyed in fee to the complainants, James L. Winter and Charles W. Winter. It thus appears that the acquisition of title by the defendant in the executions, his conveyance, and the conveyance to the complainants, occurred during the interval, when there were no executions on the judgments.

On the 10th December, 1861, an act was adopted which gave judgments the effect of liens on all the defendant's property.—(Pamphlet Acts, p. 33, § 1.) This act was repealed by the act of 8th December, 1863, but liens which had attached under it were expressly continued.—(Pamphlet Acts, 1863, p. 57.)

On the 20th July, 1865, the provisional governor of the State, by proclamation, declared, that from and after that date "the civil and criminal laws of Alabama, as they stood on the 11th day of January, 1861, except that portion" relating to slaves, should be "in full force and operation." Under the law, "as it stood on the 11th day January, 1861," liens did not result from judgments.—Revised Code, § 2872 (2456.) An ordinance of the convention, adopted on the 21st September, 1865, declared that the acts, with certain exceptions, passed after the 11th January, 1861, were ratified and valid from their dates.—Rev. Code, p. 53. James R. Dickerson having, on the 21st March, 1863, acquired a title to the land in question, a lien upon it was effected by virtue of the act of 10th December, 1861, in favor of the defendants, who had judgments rendered in 1861, before its passage. These liens were continued and preserved by the later act of 8th December, 1863. On the 1st April, 1863, James R. Dickerson conveyed. Those holding under his conveyance, unquestionably took his title, subject to the liens of the judgment creditors. It is contended, that those liens were destroyed by the proclamation of Governor Parsons, on the 20th July, 1865, and remained defunct during the interval between that day and the 21st September, 1865, when the convention, by its ordinance, restored the acts from which the liens resulted, and that during such interval the title to the land became free from the liens, and they could not

again be restored in derogation of the unencumbered character which the title took during that interval.

In the case of *Jeffries v. State*, 39 Ala. 655, it was decided by this court, that the proclamation of Governor Parsons continued the suspension of the laws of the State which were not by it declared to be in force. The same proposition was reiterated in *McDaniel v. Simpson*, at the January term, 1868. To this extent, this court is committed, and its present convictions accord with its past rulings upon the subject. The above proposition admits the obligation, *during Governor Parson's administration*, of the laws by him declared in force, to the exclusion of those enacted during the war. Whether those laws embraced by Governor Parson's declaratory proclamation, were by virtue of his declaration permanent rules of civil conduct repealing all variant prior enactments, or whether they were mere temporary orders for the regulation of conduct continued, subject to the will of the governor only during his authority, and displacing pre-existing laws, only in so far as was necessary to make the will of the governor as evidenced by his order, the prevailing regulator of conduct during the limited period of his domination, and allowing such pre-existing laws, with the rights springing from them, to revive upon the expiration of his authority, are new questions hitherto undecided by us. Those are the questions upon which the liens of the judgment creditors in this case depend.

The power of prescribing rules of conduct exercised by the provisional governor was extraordinary, and the source from which it was derived has been a subject of much discussion. In *Jeffries v. State*, the existence of the power was conceded, and it was referred to the prevalence of martial law in the State, which was enforced and executed by the President of the United States, as the commander-in-chief of the army, through the agency of an officer denominated provisional governor. The opposite theory, that the State, by its ordinance of secession and the events which followed it, severed its legal relations to the government of the United States, and stood at the close of the war in the attitude of a foreign country, conquered by the

United States, and was therefore governed as a conquered province, is not supported by any judicial precedent known to us, and seems not to be approved by the judges of the supreme court of the United States. Chief Justice Chase, upon opening the circuit court of the United States for the district of North Carolina, in June, 1867, delivered an address to the bar explanatory of the reasons of the justices of the supreme court for delaying, after the close of the war, their appearance on the circuits in the States which had been insurrectionary. This delay was attributed, in that address, to the military supremacy exercised under the direction of the president, and the competency of military tribunals to exercise the requisite civil and criminal jurisdiction which belongs, under ordinary circumstances, to civil courts. The address argues that sensibility to judicial independence permitted the justices to preside, when the president by his proclamation abrogated the military authority. At the same court, Chief Justice Chase delivered a written opinion, in the case of *Shortridge v. Mason,* upon the questions whether a debt due to citizens of Pennsylvania by a citizen of North Carolina, was discharged by a payment during the war to a receiver under the sequestration act of the Confederate government, and whether interest accrued during the war. In that opinion, he asserts, with emphasis, that the separation of North Carolina from the union was never for one moment effected. These deliverances of Chief Justice Chase very clearly indicate the opinion that the States which attempted secession did not become, by the result of the war, and the antecedent events, conquered foreign provinces; that martial law prevailed afterwards under the direction of the president, and that its prevalence was terminated in North Carolina by his authority. The address and opinion above noticed may be found in an appendix to the North Carolina State Reports of decisions at the June term, 1867. We think they contribute largely to the support of our opinion in *Jeffries v. State,* referring the authority of Governor Parsons to the prevalence of martial law.

Martial law, which was the foundation of the authority exercised by the president through a provisional governor,

is " built upon no settled principles, but is entirely arbitrary in its decisions ; is, as Sir Matthew Hale observes, in truth and reality no law, but something indulged rather than allowed as a law."—1 Blackstone's Com. 413 ; 1 Stephens on the English Court, 265. It is founded on necessity, and proclaimed by a military chief.—1 Kent, 341, n. Martial law, says Attorney General Cushing, in an able opinion, " suspends *for the time being,* all the laws of the land, and substitutes in their place no law, that is, the mere will of the military commander." In the same opinion it is said, " the civil law is suspended, *or at least made subordinate,* and its place is taken by martial law under the supreme, if not the direct, administration of the military power." 8, Opinions of Attorney Generals, 365. In *ex parte Milligan,* 4 *Wallace,* 127, the supreme court of the United States defines the origin and limits of martial law as follows : " If in foreign invasion or civil war the courts are actually closed, and it is impossible to administer criminal justice according to law, then on the theatre of active military operations, where war really prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown to preserve the safety of the army and society ; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. As necessity creates the rule, so it limits its duration.' The discussion of the subject of martial law by the counsel in this case, as reported with the decision, is able and elaborate in its array of authorities. It demonstrates, that what is called martial law is the creature of necessity, temporary in its operation, allowed as the means of governing for the time being, and only displacing civil law in so far as the will of the commander may dictate for the accomplishment of the purposes of his temporary administration. We refer, also, to the lucid and exhaustive discussion by Mr. Justice Woodbury, in the case of *Luther v. Borden,* 7 Howard, 159, *et seq.* In the case of *Griffin v. Wilcox,* decided by the supreme court of Indiana, in 1863, it was declared as follows : " Martial law arises upon the fact of existing or immediately impending force at a given time and place against legal authority, which the civil authority

is incompetent to overcome, and it is exercised precisely upon the principle on which self-defense justifies the use of force by individuals. Robbers and burglars, and in some cases rioters, may be arrested and even slain in self-defense by private individuals. * * * * This is the doctrine expressed by the maxim *inter arma silent leges.*"— Annual Cyclopedia for 1863, p. 607. On the 24th April, 1863, instructions for the government of the armies of the United States were approved by the president and promulged by the secretary of war. Those instructions were obviously intended to announce principles of the laws of war, and may therefore be consulted as some authority upon the subject of the law of war. The third and sixth of those instructions are as follows: "3. Martial law in a hostile country consists in the *suspension* by the occupying military authority of the criminal and civil laws, and of the domestic administration and government in the occupied place or territory, and in the substitution of military rule and force for the same, as well as in the dictation of the general laws, *as far as military necessity requires this suspension, substitution or dictation.*" "6. All civil and penal law shall continue to take its usual course in the enemy's places and territories under martial law, unless interrupted or stopped by order of the occupying military power; but all the functions of the hostile government, legislative, executive, or administrative, whether of a general, or provisional, or local character, cease under martial law, or continue only with the sanction, or if deemed necessary, the participation of the occupier or invader." These instructions involve the propositions, that the civil law is suspended by martial law only, in so far as it is displaced, and that the administration of it by the regular functionaries is stopped except in so far as it may be licensed by the prevailing authority.

Under martial law the military commander is not a legislator. He does not make laws, in the sense of rules of civil conduct as contradistinguished from temporary regulations governing for a particular occasion. He does not repeal laws, he merely pushes them aside and subordinates for the time being, as far as is necessary, (he being the judge,) to regulations emanating from his will for the

government of the people during the existence of his authority. Governor Parsons did not repeal the law on the subject of lien. He could not have done it. As the general who governs armies in a foreign war, he made temporary regulations extending through the period of his administration, which postponed the enforcement of the variant pre-existing laws. He divested no rights which those laws gave, but those rights continued, and upon the restoration of civil authority became capable of enforcement and execution. His orders were valid and binding during the period of their prevalence, and all rights which accrued under them during their prevalence must be upheld, but the obligation of those orders can, upon no principle, be projected beyond the period of his authority. By virtue of his absolute power he might have said, that the owner of property might convey it free from subsisting liens, and a title acquired under that order might have been sustained by the courts, but we have no such case before us. The law which gave the lien of judgment creditors in this case never ceased to be, but existing, it was pushed aside for a time, and for the limited purpose of a temporary government, and the detraction from its power is limited in extent and time by the puposes and duration of the temporary military government. Neither the purposes, the necessities, nor the orders of that government forbade the existence and force of the law so far as to preserve liens under it, and to that extent it remained law.

All the laws of the State having been suspended by the military occupation, and the consequent prevalence of military law, those which were not put in operation by the proclamation of Governor Parsons remained suspended until the adoption of the ordinance of the convention of 1865, which re-invigorated all laws and liens dependent on such laws, so that they could be enforced thereafter as they would have been before the suspension.

Affirmed.