R. W. MARSHALL ET AL., APPELLEES, v. BENJAMIN F. BUSH, RECEIVER, APPELLANT.

FILED MARCH 16, 1918.    No. 19922.

1. **Carriers:** ACCOMMODATIONS. Ordinarily the discomforts, dangers and inconveniences connected with the transportation of passengers upon freight trains require separate trains for the carriage of freight and live stock and for the carriage of passengers.

Marshall v. Bush.

2. **Railroads**: BRANCH LINES. It may become necessary in order to furnish proper service that a railroad company be required to operate a branch line at a loss.

3. **Constitutional Law**: RAILROADS: REGULATION: DUE PROCESS OF LAW. An order of a railway commission requiring a railroad company to furnish separate trains for freight and passenger service is not *prima facie* unreasonable, but if it is shown that the installation of a separate passenger train would render the operation of the branch line unremunerative, and it is conceded that both passenger and freight business within the state do not pay expenses and that the whole interstate system is in the hands of a receiver on account of inability to pay fixed charges, such order may violate the due process clause of the Constitution.

4. **Evidence**: JUDICIAL NOTICE: STATE OF WAR: GOVERNMENT OPERATION OF RAILROADS. The court will take judicial notice that a state of war exists, and that congress has placed in the hands of the government the direction and operation of the railroads of the country.

APPEAL from the State Railway Commission. *Order vacated, and cause remanded.*

*E. J. White, J. A. C. Kennedy* and *M. V. Beghtol,* for appellant.

*Willis E. Reed, Attorney General, John L. Cutright* and *Hugh La Master, contra.*

The Missouri Pacific Railway Company operates a line of railroad from Omaha to Kansas City and St. Louis. In Nebraska the road runs southward. At the station of Talmage a branch line runs westward to Crete upon the main line of the Chicago, Burlington & Quincy Railroad Company. The length of this branch is 59 miles. The towns intervening between Crete and Talmage have a total population of 1,911. At Hickman a line of the Union Pacific Railroad Company and a main line of the Chicago, Burlington & Quincy Railroad Company cross the Missouri Pacific. The lines of the Chicago, Burlington & Quincy Railroad Company nearly parallel the branch under consideration, one about six miles to the north and one about six miles to the south of it. These lines both enter the city of Lincoln,

as do the Union Pacific line spoken of, and the main line of the Chicago, Rock Island & Pacific Railroad Company, which crosses this branch near the town of Sprague. The branch passes through a rich and well-settled agricultural region, but probably largely on account of the fact that the line reaches no city or large town, and so many other lines near-by do afford such access, there has been very little passenger traffic; people living along the line at points not reached by other railroads usually driving six or eight miles to the north or south to reach the line of the Chicago, Burlington & Quincy Railroad Company.

An informal petition was filed with the Nebraska state railway commission by a number of citizens of Panama, Auburn, Cook, Douglas and the vicinity, requesting better passenger service on this branch. The defendant at this time was operating a mixed freight and passenger train each day over this branch, daily except Sunday. The answer sets forth, in substance, that the railroad company was now in the hands of a receiver; that it is an interstate carrier; that it has annually since 1909 suffered a deficit on its total business in Nebraska, the net deficit since 1909 to 1916, inclusive, varying from $85,000 to nearly $300,000; and that under the Nebraska two-cent-fare act it is compelled to transport passengers at an actual loss.

After a hearing an order was made by the commission that a passenger train be operated daily except Sunday, but giving the defendant the option to make its freight service tri-weekly. An application was afterwards made by the defendant to set aside this order and allow further testimony to be taken. This was done, and after the hearing the commission found that by reason of the nature of the freight traffic it is necessary to schedule freight trains on this branch so as to make connection with the stock train on the main line from Kansas City to Auburn; that it is impossible to do this and to make connection with any passenger

trains on the main line or with passenger trains on the lines of the Burlington running to Lincoln; that it is impossible to know what the passenger traffic would be if adequate passenger trains were operated making connections at junction points. It was ordered that the defendant install and operate upon this branch a passenger train each way daily except Sunday. From this order defendant appeals.

Letton, J.

Four errors are assigned: (1) That the evidence does not sustain the order of the commission as to inadequacy of service; (2) that the trains required cause an unreasonable burden to be placed upon the interstate business of defendant; (3) that the receipts from the operation of the trains would be so light compared with the expense of operation as to be confiscatory; (4) that the order is unreasonable, denies the equal protection of the law to the railroad company, and deprives it of its property without due process of law.

By the decisions of the United States supreme court in the cases of *Chesapeake & O. R. Co. v. Public Service Commission*, 242 U. S. 603. *Wisconsin, M. & P. R. Co. v. Jacobson*, 179 U. S. 287, *Atlantic C. L. R. Co. v. North Carolina Corporation Commission*, 206 U. S. 1, and *Missouri P. R. Co. v. State of Kansas*, 216 U. S. 262, the following principles seem to be definitely established: By the acceptance of a charter which confers upon it the power of eminent domain and other valuable privileges a railroad company assumes certain duties. It must exercise the functions for which it was organized and in consideration of which the privileges were conferred. Under the statute of 1866 in force until 1913, railroad corporations were required to "furnish sufficient accommodations for the transportation of passengers and freight," and it was required also that every such corporation "shall take, transport, and discharge all passengers to and from such stations as the trains stop at, from or to all places

and stations upon their said road, on the due payment of fare or freight bill." Rev. St. 1866, ch. 25, sec. 121 (Ann. St. 1911, sec. 10596). They were also made liable in damages for refusal to transport any property or passenger. Rev. St. 1866, ch. 25, sec. 122 (Rev. St. 1913, sec. 6059). Long before the defendant railroad company entered the state, these provisions, which really are merely declaratory of the common law, imposed fixed duties upon every railroad corporation seeking to do business in the state, and defendant by accepting the benefits of the statute assumed the burdens imposed thereby. Railroads are public highways, and the right and duty of the government to regulate the conduct and business of railroad corporations have been founded on that fact. In relation to all highways the duty of regulation is governmental in its nature. It is because they are exercising a governmental function that the power of eminent domain is given to them. But the government cannot require a railroad corporation to carry on the duties imposed by its acceptance of its charter and at the same time by the imposition of unreasonable and confiscatory rates deprive it of its property without due process of law.

There is a distinction, however, between imposing the duty of service and the regulation of rates. It may become necessary, in order to furnish proper service as required under the charter, that a railroad company be required to operate a branch line at a loss, or to furnish certain other service for less than actual cost. It is also true that the nature and extent of the existing facilities furnished by a railroad company must be considered in determining whether a requirement that such facilities be increased is just and reasonable. If it were shown that the enforcement of the order would so affect the general scheme of the operation of the entire system that it would inevitably require its operation at a loss, then the order might be considered so unreasonable as to violate the Fourteenth Amendment,

U. S. Const. *Chesapeake & O. R. Co. v. Public Service Commission,* 242 U. S. 603:

Ordinarily the known discomforts, disadvantages, dangers and annoyances connected with the transportation of passengers upon freight trains require separate trains for the carriage of freight and live stock and for the carriage of passengers. A full discussion of this point may be found in *People v. St. Louis, A. & T. H. R. Co.,* 176 Ill. 512, 35 L. R. A. 656, and in *Missouri P. R. Co. v. State of Kansas,* 216 U. S. 262. We agree with the doctrine of these cases. The legislature of Nebraska has evidently taken the same view, as it has provided in the act specifying the necessary equipment to be placed upon gasoline motor cars or gasoline trains (Laws 1909, ch. 97) that the state railway commission shall have the power to release any railway company from such requirement "on new roads where steam passenger trains have not been regularly run, until such time as the business will warrant better service, also on parts of roads where at least one steam passenger train has run, which makes regular stops at least six days in the week; *provided, mixed freight and passenger trains shall not be considered passenger trains.*" Rev. St. 1913, sec. 5986.

*Prima facie,* therefore, an order requiring proper facilities to be furnished passengers is reasonable. It is shown that the expense of operating this train will amount to more than $22,000 a year. It is very doubtful whether the operation of a passenger train will pay expenses for many years, unless defendant is allowed to increase its rates. It is clear it will not be presently remunerative. The more fact that the rendition of a certain class of service by a railroad company may be unremunerative is not sufficient to relieve it from the duty of furnishing the same. *Cram v. Chicago, B. & Q. R. Co.* 84 Neb. 607; *Davison v. Chicago & N. W. R. Co.,* 100 Neb. 462. As pointed out in *Atlantic C. L. R. Co. v. North Carolina Corporation Commission,* 206 U.

S. 1, and in *Missouri P. R. Co. v. State of Kansas*, 216 U. S. 262, there is a distinction between requiring service to be performed upon a portion of a railroad system at a loss and the fixing of a schedule of rates for transportation so unreasonably low as to require the whole system to be operated at confiscatory rates. In the one case the loss incidental to the operation of a portion of the system in the prescribed manner may be met by a readjustment of train service or other economies on other parts of the system, whereas inadequate rates applying to the whole system must inevitably result in a form of confiscation forbidden by the Constitution of the United States. *Smyth v. Ames*, 169 U. S. 466, 526; *Chesapeake & O. R. Co. v. Public Service Commission*, 242 U. S. 603. It is undisputed that the returns from the operation of defendant's lines in Nebraska are not compensatory; it seems to be conceded that, being unable to pay the interest on its bonded debt and other charges, the corporation is in the hands of a receiver, and that the whole system is unremunerative. These conditions defendant insists bring the case within the principles of *Smyth v. Ames, supra.* If the defendant were at liberty to raise its rates to cover the increased cost of operation, this argument would have no force; but it has been decided that, the legislature having fixed the rates, the state railway commission is without power to alter them. *State v. Clarke*, 98 Neb. 566. It would be a violation of the statute if the defendant did so.

Since the rendition of the order complained of, a condition has arisen of which the court is justified in taking judicial notice. The country is now in a state of war, and the government of the United States has assumed control over the operation of the railroads. There is a deficiency in motive power and of cars, and a shortage of men. To take the necessary engines and rolling stock to operate this train may decrease to that extent the facilities of defendant for the patriotic duty

which is imposed upon it of doing everything possible to meet the demands in the transportation field imposed by the new conditions. Without deciding that the order was unreasonable when made—though inclined to so hold—we are reluctant to sustain it under these circumstances. We have concluded that the order should remain in abeyance until an opportunity is given to the railway commission to consider how far the order may impinge upon the powers given by congress to the director general of railways over the operation of the railroads during the war, and whether under the present conditions the order should not be vacated. The order is set aside and the matter remanded to the state railway commission for further hearing and consideration.

ORDER VACATED.

SEDGWICK, J., not sitting.