(81 South. 417)

## VAUGHN v. STATE. (3 Div. 338.)

(Court of Appeals of Alabama. March 18, 1919.
Rehearing Denied April 8, 1919.)

1. WITNESSES ☞274(2), 286(4)—CHARACTER
WITNESS—CROSS AND REDIRECT EXAMINA-
TION.

It was permissible, on cross-examination of
defendant's character witness, to question him
respecting reports or rumors in the community
tending to shed light on the estimate placed
by him on defendant's character, but it was not
permissible on redirect examination to inquire
as to the particulars of such reports.

2. CRIMINAL LAW ☞379—GENERAL CHARAC-
TER OF DEFENDANT—EVIDENCE—ADMISSI-
BILITY.

Defendant is limited to proof of his general
good character.

3. RECEIVING STOLEN GOODS ☞7(6)—OWN-
ERSHIP—VARIANCE.

Under Act Cong. Aug. 29, 1916 (U. S. Comp.
St. § 1974a), and Act Cong. March 21, 1918
(U. S. Comp. St. 1918, §§ 3115¾a–c, e, f, j),
Proclamations of the President Dec. 26, 1917,
and April 11, 1918 (U. S. Comp. St. 1918, pp.
274, 275), and General Orders of the Director
General of Railroads, held, that a railroad was
operating under federal control as an agency of
the government, and as such was the bailee of
the property alleged to have been stolen, so
that there was no variance though the property
was alleged to be that of the company.

4. WAR ☞4—CONTROL OF TRANSPORTATION—
POWER OF FEDERAL GOVERNMENT.

The same authority inherent in the federal
government through which it has called into its
service under a system of selective draft its
citizen soldiery may be used to commandeer and
mobilize its corporate citizenship for the pur-
pose of moving and supplying the army with
substances and material for military operation.

5. CRIMINAL LAW ☞1137(5)—INVITED ERROR
—ADMISSION.

Though defendant's admission, involving a
mere matter of procedure, may be inconsistent
with matters of judicial knowledge, defendant
who invited action on the admission will not be
allowed to gainsay it for the purpose of putting
the trial court in error.

6. CRIMINAL LAW ☞304(2) — JUDICIAL NO-
TICE—COMMON KNOWLEDGE.

The courts take judicial knowledge of all
matters of common knowledge.

7. CRIMINAL LAW ☞304(2) — JUDICIAL
KNOWLEDGE—PUBLIC HISTORY.

The courts take judicial knowledge of all
matters of public history.

8. CRIMINAL LAW ☞304(9) — JUDICIAL
KNOWLEDGE—STATUTES.

The courts take judicial knowledge of stat-
utes, both state and federal.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

9. CRIMINAL LAW ⬤➡304(9) — JUDICIAL KNOWLEDGE — PROCLAMATIONS OF PRESIDENT.

The courts take judicial knowledge of the proclamations of the President of the United States.

10. CRIMINAL LAW ⬤➡304(9) — JUDICIAL KNOWLEDGE—GENERAL MILITARY ORDERS.

The courts take judicial knowledge of general military orders.

11. WAR ⬤➡4 — FEDERAL CONTROL OF RAILROADS—EXTENT.

Act Cong. March 21, 1918 (U. S. Comp. St. 1918, §§ 3115¾a-c, e, f, j), and the Orders of the Director General of Railroads, clearly evince a construction of Act Cong. Aug. 29, 1916 (U. S. Comp. St. § 1974a), and the action of the President thereunder, inconsistent with the view that federal control extends to and embraces only the property and facilities of transportation companies.

12. STATUTES ⬤➡219 — CONTEMPORANEOUS CONSTRUCTION—ADOPTION.

Since the language of Act Cong. Aug. 29, 1916 (U. S. Comp. St. § 1974a), empowering the President in time of war to take possession and assume control of systems of transportation, is not so plain and unambiguous that it is not susceptible of "different or contrary reasonable constructions," the contemporaneous construction by those intrusted with its enforcement may be looked to.

13. WAR ⬤➡4—CONTROL OF TRANSPORTATION SYSTEM—"DIRECTOR GENERAL OF RAILROADS."

Federal control of the transportation systems of the country contemplated and effected mobilization under one head of the persons and corporations engaged in the business, as well as the facilities of transportation for the purpose of meeting and coping with the conditions due to the United States being at war, and the "Director General of Railroads" is what the title imports, the general in command of the army of transportation.

14. WAR ⬤➡4—FEDERAL CONTROL OF TRANSPORTATION—ORDER OF DIRECTOR GENERAL.

Assuming that General Order No. 50, as to all actions and suits being brought against the Director General of Railroads, is one which Director General had power to make, despite Act Cong. March 21, 1918 (U. S. Comp. St. 1918, § 3115¾j), providing for actions and suits against the carriers, the Director General's authority is sustainable under no other theory than that the transportation companies themselves are under federal control.

15. WAR ⬤➡4—RAILROADS—CONTROL BY DIRECTOR GENERAL.

If the transportation companies are under federal control, the Director General is without authority to interfere with the orderly administration of justice or to set aside the ordinary and usual course of procedure in courts of justice according to the course of the common law.

16. CONSTITUTIONAL LAW ⬤➡309(1)—ORDERS OF DIRECTOR GENERAL—DUE PROCESS.

Order of Director General of Railroads (General Order No. 50), as to amending pleadings in pending actions and suits against any carrier company by substituting the director general as party defendant, outlines a course of procedure amounting to a-denial of due process of law.

17. WAR ⬤➡4 — TRANSPORTATION — CONTROL BY FEDERAL GOVERNMENT.

The act of the government in assuming federal control of transportation companies is referable solely to the exercise of military power as a means of meeting the emergencies imposed by a state of war, and can be justified on no other theory.

18. ARMY AND NAVY ⬤➡34—ACTS OF PERSONS IN MILITARY SERVICE—LIABILITY.

Persons engaged in the military service are not liable in action for damages for acts done in the course of their military duties in obeying a military order.

19. UNITED STATES ⬤➡78—LIABILITY FOR CONDUCT OF OFFICERS AND EMPLOYÉS.

The government is not liable for tortious conduct, misfeasance, or laches of its officers or employés, unless its consent thereto is given by some act of Congress.

20. UNITED STATES ⬤➡125—SUITS—PARTIES.

The rule as to the immunity of the federal government from being sued prevents the substitution of an officer of the government as a party, where the purpose of the suit affects the right or destroys the liability of the government.

21. WAR ⬤➡4—LIABILITY AS AFFECTED BY FEDERAL CONTROL.

The only authority for suing a carrier while under federal control must be rested upon Act Cong. March 21, 1918 (U. S. Comp. St. 1918, § 3115¾j), which subjects them "to all laws and liabilities as common carriers" with certain exceptions, and provides that "actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law."

Appeal from Circuit Court, Montgomery County; Leon McCord, Judge.

Frank S. Vaughn was found guilty under an indictment charging that he did buy, receive, and conceal, or aid in concealing, certain stolen property, and he appeals. Affirmed.

Hill, Hill, Whiting & Thomas, of Montgomery, for appellant.

Emmett S. Thigpen, Atty. Gen., and David W. W. Fuller, Asst. Atty. Gen., for the State.

BROWN, P. J. The verdict of the jury responds to the first count of the indictment, charging that—

The defendant "did buy, receive, conceal, or aid in concealing, thirty-three caddies of tobacco of the value of one hundred and sixty-four dol-

lars, the personal property of the Louisville & Nashville Railroad Company, a corporation, knowing that it was stolen, and not having intent to return it to the owner."

There was evidence tending to support the averments of the indictment, unless the contention of appellant that there was a variance in the averments and proof is sustained.

[1, 2] It was permissible, on cross-examination of the defendant's character witness De Weise, for the solicitor to question the witness respecting reports or rumors in the community tending to shed light on the estimate placed by the witness on the defendant's character, and it was not permissible for the defendant, on the redirect examination, to inquire as to the particulars of such reports. The defendant is limited to the proof of his general good character and had the benefit of any favorable lights respecting such rumors in the fact that, with a knowledge of such reports, the witness pronounced the defendant's character good. Stout v. State, 15 Ala. App. 206, 72 South. 762; s. c., 73 South. 1002;[1] Sexton v. State, 13 Ala. App. 84, 69 South. 341; s. c., 195 Ala. 697, 70 South. 1014.

The questions of the solicitor did not call for a part of a specific conversation with or between particular persons, and the case of Davis v. State, 92 Ala. 20, 9 South. 616, and other cases cited by appellant, are not applicable.

[3] As a predicate for the contention that there is a fatal variance between the averments and proof, entitling the defendant to an acquittal, the bill of exceptions recites that—

"It was admitted as a fact by and between the state of Alabama, through its solicitor, on the one part, and the defendant, on the other, that on the first day of April, 1918, the Louisville & Nashville Railroad Company was taken over by the United States government under and by virtue of an act of Congress entitled, 'An act to provide for the operation of transportation systems while under federal control, for the just compensation of their owners and for other purposes,' which act was approved March 21, 1918, and that from said date of April 1, 1918, up to the present time, said railroad has been so operated and was being so operated and controlled at the time of the alleged commission of the offense. This fact is admitted as being true."

[4, 5] This is an admission by the appellant that the corporation, as well as its physical property and facilities of transportation, was under federal control at the time of the commission of the offense, and carries with it the idea that the government, in assuming control of the transportation facilities of the country for military purposes, commandeered and mobilized the services of the carriers themselves. There can be no doubt that the same authority, inherent in the federal government, through which it has called into its service under a system of selective draft its citizen soldiery, may be used to commandeer and mobilize its corporate citizenship for the purpose of moving and supplying the army with the substances and material for military operation. So we are confronted with an admission that is not inconsistent with a policy within the range of governmental power, and though the admission may be inconsistent with matters of judicial knowledge, involving as it does a mere matter of procedure, the appellant having invited the action of the trial court on this admission of fact, he will not be allowed to gainsay it for the purpose of putting the court in error. Western Union Telegraph Co. v. Emerson, 14 Ala. App. 247, 69 South. 335; Travis v. Sloss-Sheffield Steel & Iron Co., 162 Ala. 606, 50 South. 106; Tygh v. Dolan, 95 Ala. 269, 10 South. 837.

Under this theory of federal control, the identity of the carrier—the corporate entity —has not been destroyed, nor has it been rendered wholly impotent in respect to its functions in the conduct of the business. It has merely become an agency of the government for the purpose of carrying out the policy of preferring the movement of troops, military equipment, and military supplies over matters of general commerce, and, as such agent, is a bailee of goods committed to it for transportation, and it is sufficient to lay the ownership of the goods in the corporation in an indictment for the larceny of such goods, or for like offenses. Viberg v. State, 138 Ala. 100, 35 South. 53, 100 Am. St. Rep. 22; Fowler v. State, 100 Ala. 96, 14 South. 860.

[6-10] Moreover, the appellant's admission is not in conflict with matters of judicial knowledge. It is well settled that courts take judicial knowledge of all matters of common knowledge and public history and of statutes, both state and federal (3 Mayf. Dig. pp. 437–439), and likewise of the proclamations of the President of the United States and of general military orders (Jeffries & Jeffries v. State, 39 Ala. 655; Dooley v. Pennsylvania R. R. Co. [D. C.] 250 Fed. 142; Muir v. L. & N. R. R. Co. [D. C.] 247 Fed. 888; Marshall et al. v. Bush [Neb.] 167 N. W. 59, L. R. A. 1918E, 385).

The act of Congress of August 29, 1916, to which the President's proclamation assuming federal control of railroads is referable, provides:

"The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of *any system or systems of transportation*, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable." U. S. Comp. St. 1918, § 1974a.

[1] 198 Ala. 695.

The terms "system or systems of transportation" embodied in this statute have been construed by the President, the Congress, and the Director General of Railroads, to embrace, not only the property and facilities of transportation, but the transportation companies. From the proclamation of the President of December 26, 1917, we take the following:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolutions and statute, and by virtue of all other powers thereto me enabling, do hereby, through Newton D. Baker, Secretary of War, take possession and assume control at 12 o'clock noon on the twenty-eighth day of December, 1917, of each and every *system of transportation* and the appurtenances thereof located wholly or in part within the boundaries of the continental United States and consisting of *railroads*, and owned or controlled systems of coastwise and inland transportation, *engaged in general transportation*, whether operated by steam or by electric power, including also terminals, terminal *companies* and terminal *associations*, sleeping and parlor cars, private cars and private car lines, elevators, warehouses, telegraph and telephone lines and all other equipment and appurtenances commonly used upon or operated as a part of such rail or combined rail and water systems of transportation; to the end that such systems of transportation be utilized for the transfer and transportation of troops, war material and equipment, to the exclusion so far as may be necessary of all other traffic thereon; and that so far as such exclusive use be not necessary or desirable, such systems of transportation be operated and utilized in the performance of such other services as the national interest may require and of the usual and ordinary business and duties of common carriers.

"It is hereby directed that the possession, control, operation and utilization of such transportation systems hereby by me undertaken shall be exercised by and through William G. McAdoo, who is hereby appointed and designated Director General of Railroads. Said director may perform the duties imposed upon him, so long and to such extent as he shall determine, through the *boards of directors, receivers, officers and employés of said systems of transportation.* Until and except so far as said director shall from time to time by general or special orders otherwise provide, the *boards of directors, receivers, officers* and employés of the vaious *transportation systems* shall continue the operation thereof in the usual and ordinary course of business of common carriers in the *names of their respective companies.*"

U. S. Comp. St. 1918, p. 274.

And from the proclamation of April 11, 1918:

"Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolutions and statute, and by virtue of all other powers thereto me enabling, do hereby, through Benedict Crowell, Acting Secretary of War, take possession and assume control at 12:01 a. m. on the 13th day of April, 1918, of each and every system of transportation and the appurtenances thereof as follows, to wit: Clyde Steamship Company, *a corporation* of the state of Maine; Mallory Steamship Company, *a corporation* of the state of Maine; Merchants' & Miners' Transportation Company, *a corporation* of the state of Maryland, and Southern Steamship Company, *a corporation* of the state of Delaware, consisting of steamships, tugs, lighters, barges, ships, boats, and marine craft of any and every kind or description and all the tackle appurtenances to and appliances thereof, together with all wharves, docks, warehouses and other property of every kind or nature, real or chattel, owned, leased, chartered, controlled or used by said companies or either of them in conducting or in connection with said transportation systems, to the end that such *systems of transportation* be utilized for the transfer and transportation of troops, war material, and equipment. * * *

"Until and except so far as said Director General shall from time to time by general or special orders otherwise provide, the *boards of directors, officers, and employés of said transportation systems* shall continue the operation thereof in the usual and ordinary course of the business of common carriers, in the names of *their respective companies.* * * *

"That none of said *carriers* while under federal control shall, without the prior approval of the President, declare or pay any dividends in excess of its regular rate of dividends during the three years ended June thirtieth, nineteen hundred and seventeen: Provided, however, that such carriers as have paid no regular dividends or no dividends during said period may, with the prior approval of the President, pay dividends at such rate as the President may determine." U. S. Comp. St. 1918, p. 275.

We take the following excerpts from the acts of Congress of March 21, 1918:

"The President, having in time of war taken over the possession, use, control, and operation (called herein federal control) of certain *railroads and systems of transportation (called herein carriers),* is hereby authorized *to agree with and to guarantee to any such carrier* making operating returns to the Interstate Commerce Commission, that during the period of such federal control it shall receive as just compensation an annual sum, payable from time to time in reasonable installments, for each year and pro rata for any fractional year of such federal control, not exceeding a sum equivalent as nearly as may be to its average annual railway operating income for the three years ended June thirtieth, nineteen hundred and seventeen. * * *

"Every such agreement shall provide that any federal taxes under the act of October third, nineteen hundred and seventeen, or acts in addition thereto or any amendment thereof, commonly called war taxes, assessed for the period of federal control beginning January first, nineteen hundred and eighteen, or any part of such period, shall be paid by *the carriers* out of its own funds, or shall be charged against or deducted from the just compensation. * * *

"If no such agreement is made, or pending the execution of an agreement, the President may nevertheless pay to any carrier while under federal control an annual amount, payable in

reasonable installments, not exceeding ninety per centum of the estimated annual amount of just compensation, remitting such carrier, in case where no agreement is made, to its legal rights for any balance claimed to the remedies provided in section three hereof. * * * The acceptance of any benefits under this section shall constitute an acceptance by *the carrier* of all the provisions of this act and shall obligate *the carrier* to pay to the United States, with interest at the rate of six per centum per annum from a date or dates fixed in proceedings under section three, the amount by which the sums received under this section exceed the sum found due in such proceedings. * * *

"All claims for just compensation not adjusted (as provided in section one) shall, on *the application of the President or of any carrier*, be submitted to boards, each consisting of three referees to be appointed by the Interstate Commerce Commission, members of which and the official force thereof being eligible for service on such boards without additional compensation. * * * Failing such agreement, either the United States or such *carrier may file a petition* in the Court of Claims for the purpose of determining the amount of such just compensation. * * *

"*No carrier while under federal control* shall, without the prior approval of the President, declare or pay any dividend in excess of its regular rate of dividends during the three years ended June thirtieth, nineteen hundred and seventeen. * * *

"The President may also make or order any *carrier* to make any additions, betterments, or road extensions, and to provide terminals, motive power, cars, and other equipment necessary or desirable for war purposes or in the public interest on or in connection with the property of any carrier. * * *

"Any loss claimed by any carrier by reason of any such additions, betterments, or road extensions so ordered and constructed may be determined * * * between the President and such carrier; failing such agreement the amount of such loss shall be ascertained as provided in section three hereof. · * * *

· "*Carriers while under federal control* shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and *against such carriers* and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an *instrumentality or agency of the federal government*. Nor shall *any such carrier* be entitled to have transferred to any federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the federal control *of such carrier*," etc. U. S. Comp. St. 1918, pp. 456–458.

From the general orders of the Director General of Railroads, we take the following:

"General Order No. 1.

"*To All Concerned:*

"Pursuant to the order of the President of the United States, through the Secretary of War, the undersigned, as Director General of Railroads, has taken possession and assumed control of certain *transportation systems* described in the proclamation of the President, of which proclamation and order officers, agents and employés of said transportation systems are to take immediate and careful notice.

"*All Employés to Continue.*

"In addition to the provisions therein contained it is, until further ordered, directed that—

"1. *All officers, agents* and *employés of such transportation systems* may continue in the performance of their present regular duties, reporting to the same offices as heretofore and on the same terms of employment.

"2. Any officer, agent or employé desiring to retire from his employment shall give the usual and seasonable notice to the proper officer to the end that there may be no interruption or impairment of the transportation service required for the successful conduct of the war and the needs of general commerce.

"General Order No. 2.

"*To the Chief Executive of the Railroads:*

"Pursuant to the authority vested in me by the President of the United States in his proclamation of December 26, 1917, wherein it was stated that for purposes of accounting, possession and control of the railroads shall date from 12:00 o'clock midnight of December 31, 1917, you are notified that, until otherwise directed, no changes in the present methods of accounting as prescribed by the Interstate Commerce Commission will be required. The accounts of your respective companies shall be closed as of December 31, 1917, and opened as of January 1, 1918, in the same manner as they have heretofore been handled at the close of one fiscal period and the beginning of another; and in the same manner that you should have handled your accounts had the government not taken possession and control."

"All *carriers* by railroad, subject to the jurisdiction of the undersigned, are hereby ordered and directed forthwith to publish and file, and to continue in effect until further order, tariffs effective January 21, 1918, wherein demurrage rules, regulations, and charges shall be changed so as to provide * * *

"Carriers shall immediately file said tariffs with appropriate state commissions or other state authorities."—General Order No. 3.

"*To Officers and Directors of Railroad Companies:*

"During the period of possession, operation and government control of railroads, it is necessary that officers, directors, and agents of railroad companies be very careful in handling of moneys and in the dealing with transportation matters. Without attempting at this time to give general directions, there are a few matters involving the expenditure of money for purposes having no direct relation to transportation, which should receive immediate attention; as

well as the issuance of free transportation. * * * "—General Order No. 6.

. "All *carriers* by railroads, subject to the jurisdiction of the undersigned, are hereby ordered and directed forthwith to *publish* and *file,* and to continue in effect until further order, tariffs in the form shown in the attached appendix, effective February 10, 1918, wherein demurrage rules, regulations, and charges shall be changed so as to provide: * * * "—General Order No. 7.

"A *carrier* shall not create an additional office or fill a vacancy in an existing office, except when such step is necessary to the operation of the railroad under the existing conditions of government possession and control. In cases of doubt, application, with statement of salary proposed, may be made through the regional director for the Director General's approval.

"A *carrier* shall not fill a vacancy in office of or above the grade of general manager or create such an office without the approval of the Director General. Application with statement of salary proposed may be made through the regional director for the Director General's approval. * . * * "—General Order No. 9.

"Each and every *carrier* subject to federal control shall, prior to May 1,. 1918, commence taking an inventory of its materials and supplies by actual count, measurement, weight, etc., and shall immediately upon completion thereof adjust such inventory, by additions and deductions, to December 31, 1917; provided, however, that any such carrier that has taken an inventory of its materials and supplies in the form indicated within 90 days prior to December 31, 1917, or subsequent to the latter date, shall not be required to take an additional inventory, but shall adjust the inventory previously taken, by additions and deductions, to December 31, 1917."—General Order No. 10.

*"To Chief Executive Officers of Carriers Subject to Federal Control:*

"Effective May 1, 1918, all freight forwarded from one point in the United States to another point in the United States (including freight passing through Canada or Mexico enroute), and moving over two or more railroads or boat lines under federal control, must be waybilled through from point of origin to destination, regardless of the absence of joint rates. When destination station is on a railroad not under federal control, freight should be waybilled to the junction point with such road; provided, however, that nothing in this paragraph shall prohibit waybilling arrangements between carriers now under federal control and others not so controlled. * * * "—General Order No. 11.

*"To Chief Executive Officers' of Carriers Subject to Federal Control:*

"It is hereby ordered that the following rules and regulations shall be observed and shall govern the recording of the accounting for all transactions which arise during federal control: * * * "—General Order No. 17..

"Whereas the act of Congress, approved March 21, 1918, entitled *an act to provide for the operation of transportation systems while under federal control,* provides (section 10) 'That *carriers* while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this Act or with any order of the President. * * * But no process, mesne or final, shall be levied against any property under such federal control;' and * * *

"It is therefore ordered, that all suits against *carriers* while under federal control must be brought in the county or district where the plaintiff resides, or in the county or district where the cause of action arose. * * * "— General Order No. 18.

"Each and every *carrier* subject to federal control shall render a weekly cash report on Form T-5, as per copy herewith. * * * "— General Order No. 23.

"Respecting the wages, hours and other conditions of employment of the employés of the railroads hereinafter mentioned.

"It is hereby ordered:

## "Article I.—Railroads Affected.

"This order shall apply to the employés of the following railroads: (Cataloguing a great number of railroads, including the Louisville & Nashville Railroad Company.)"—General Order No. 27.

"Whereas it appears that there are now pending against *carriers under federal control* a great many suits for personal injury, freight and damage claims, and that the same are being pressed for trial by the plaintiff in states and jurisdictions far removed from the place where the persons alleged to have been injured or damaged resided at the time of such injury or damage, or far remote from the place where the causes of action arose; the effect of such trials being that men operating the trains engaged in hauling war materials, troops, munitions or supplies, are required to leave their trains and attend court as witnesses, and travel sometimes for hundreds of miles from their work, necessitating absence from their trains for days and sometimes for a week or more; which practice is highly prejudicial to the just interests of the government and seriously interferes with the physical operation of railroads; and the practice of trying such cases during federal control in remote jurisdictions is not necessary for the protection of the rights or the just interests of plaintiffs:

*"It is therefore ordered,* that upon a showing by the defendant carrier that the just interests of the Government would be prejudiced by a present trial of any suit against *any carrier under federal control* which suit is not covered by General Order No. 18 and which is now pending in any county or district other than where the cause of action arose or other than in which the person alleged to have been injured or damaged at that time resided, the suit *shall not* be tried during *the period of federal control; provided,* if no suit on the same cause of action is now pending in the county or district where the cause of action arose, or where the person injured or damaged at the county or district where the cause of action arose, or where the person injured or damaged at that time resided, a new suit may, upon proper service, be instituted therein; and if such suit is now barred by the statute of limitations, or will be barred before October 1, 1918, then the stay directed by this

order shall not apply unless the defendant carrier shall stipulate in open court to waive the defense of the statute of limitations in any such suit which may be brought before October 1, 1918.

"This order is declared to be necessary in the present war emergency. In the event of unnecessary hardship in any case *either party* may apply to the Director General for relief, and he will make such order therein as the circumstances may require consistent with the public interest."—General Order No. 26.

"Whereas certain of the *railroads now under federal control* have in existence at this time, *agreements* with the International Association of Machinists, International Brotherhood of Boilermakers. * * * "—General Order No. 29.

"Effective July 1, 1918, the following regulations shall govern the settlement of all interroad bills, statements, and accounts rendered by one *carrier under federal control* against or for account of another carrier under such control."—General Order No. 30.

"Effective July 1, 1918, the following rules and regulations shall govern the accounting for the use of equipment or facilities of one *carrier under federal control* by or for the account of another *carrier under such control*, provided, nothing herein contained shall be construed to warrant the discontinuance of the keeping, rendition and settlement of such accounts by a carrier under *federal control* in favor of or against a carrier *not* under *federal control* in the same manner as heretofore: * * * "—General Order No. 31.

"Interline passenger revenue shall be apportioned to interested *carriers under federal control* by the initial carrier on bases of mileage applying via route over which the service is performed."—General Order No. 32.

"*Carriers subject to federal control shall sell* at public auction to the highest bidder, without advertisement, carload and less than carload nonperishable freight that has been refused or is unclaimed by consignee and has been on hand for a period of sixty days. * * *

"Perishable freight shall be sold whenever in the judgment of the agent or other representative of *the carrier* it is necessary to do so."—General Order No. 34.

"The following regulations will govern *carriers* under federal control in investigating, paying and accounting for freight claims for loss and damage arising during federal control. They will not affect the distribution of settlements involving any road not under federal control, nor the distribution of settlements involving any road not under federal control, nor the distribution of claims clearly applicable to the period prior to federal control: * * *

"5. *Loss or Damage Definitely Located:* Claims for loss or damage definitely located, the legal liability for which has been established and payment made, shall be charged direct to carrier or carriers responsible therefor.

"6. *Loss or Damage Unlocated:* Claims for unlocated loss or damage, the legal liability for which has been established and payment made, shall be apportioned to interested carriers on mileage basis, with minimum of ten miles for any carrier. * * *

"8. *Minimum Debits:* Except as provided in Paragraph 5 hereof, the entire amount of any individual loss and damage claim shall be absorbed by the *settling carrier* unless the amount chargeable against all other *carriers under federal control* in interest exceeds five dollars ($5.00). Proportions less than one dollar ($1.00) against any one carrier shall, however, be absorbed by the settling carrier. * * *

"11. *Method of Payment:* Loss and damage freight claims shall be audited and paid on regularly audited vouchers in the same manner as other operating expenses are vouched. Such vouchers shall be approved for audit by the freight claim agent, and for payment by or under the direction of the officer designated to approve vouchers for payment. Provided, however, loss and damage freight claims may be paid by drafts drawn upon the federal or local federal treasurer having jurisdiction within the same limitations which are now in effect and authorized by the officer in charge of such authorization.

"12. *Custody of Claim Papers:* Claim papers shall remain in possession of *paying carrier*, except that where individual claims are charged in full to another carrier, the papers may be sent to such *carrier* upon request. When documents supporting either paid or unpaid claims leave possession of carrier, they shall be plainly stamped *with carrier's name* and claim number."—General Order No. 41.

[11] The act of Congress of March 21, 1918, and the orders of the Director General of Railroads from which we have taken the foregoing excerpts (italics being supplied); clearly evince a construction of the act of August 29, 1916, and the action of the President thereunder, inconsistent with the view that federal control extends to, and embraces, only the property and facilities of the transportation companies. In fact, the act of March 21, 1918, defines the terms "system or systems of transportation" as used in the act of August 29, 1916, and the proclamation of the President, thus:

"The President, having in time of war taken over the possession, use, control, and operation (called herein federal control) of certain railroads and systems of transportation (called herein carriers)," etc.

[12] It cannot be said that the language of the act of August 29, 1916, is so plain and unambiguous that it is not susceptible of "different or contrary reasonable constructions," and in such cases the contemporaneous construction of a statute by those who are intrusted with its enforcement may be looked to by the courts in interpreting and applying such statutes. Montgomery Light & Traction Co. v. Avant (Sup.) 80 South. 497;[2] State ex rel. Turner v. Henderson, 74 South. 346, L. R. A. 1917F, 770;[3] Ex parte Stollenwerck (Sup.) 78 South. 454;[4] Ullman Bros. v. State, 79 South. 625.[5] The "systems of transportation" or "carriers"—if the language used in the quoted excerpts is to be given its ordinary meaning—have officers and em-

[2] 202 Ala. 404.    [3] 199 Ala. 244.    [4] 201 Ala. 392.    [5] 202 Ala. 154.

ployés, are capable of contracting and being contracted with, may sue and be sued, plead and be impleaded, are entitled to compensation, are capable of arbitrating differences with the government, are authorized to settle and adjust claims, and declare dividends; in short, are capable of exercising all the functions and powers of corporations with limitations essential to federal control and the carrying out of the purposes of the government (preferring the movement of war material and army supplies over other commerce) to meet the extraordinary conditions imposed by the fact that the United States is at war with a foreign power.

[13] These facts lead to the inevitable conclusion that federal control of the transportation systems of the country contemplated and effected a mobilization under one head of the persons and corporations engaged in the business, as well as the facilities of transportation for the purpose of meeting and coping with these extraordinary conditions, and the "Director General of Railroads" is just what this designation or title imports— the general in command of the army of transportation.

In the case of Marshall v. Bush (Neb.) 167 N. W. 59, L. R. A. 1918E, 385, the Supreme Court of Nebraska, in annulling an order of the Railroad Commission of that state requiring Bush, as receiver of the Missouri Pacific Railroad Company, to place in service an extra train, recognized this theory of federal control. It was there said:

"Since the rendition of the order complained of, a consideration has arisen of which the court is justified in taking judicial notice. The country is now in a state of war, and the government of the United States has assumed control over the operation of the railroads. There is a deficiency in motive power and cars, and a shortage of men. To take the necessary engines and rolling stock to operate this train may decrease to that extent the facilities of defendant for the patriotic duty which is imposed upon him of doing everything possible to meet the demands in the transportation field imposed by the new conditions."

This policy has not been solely applied to persons engaged in the transportation business, but it has been carried out in every conceivable occupation and walk of life. The banking system has been organized to gather —through the Liberty Loan plan—the means of prosecuting the war; the manufacturing plants to supply war materials; the mining interests for supplying fuel; the agricultural interests for supplying food; the press, for the promulgation of wholesome propaganda and the repression of that which is vicious; and the wholesalers and retailers of foodstuffs and fuel; and housewives of the country for the conservation of such resources. In short, the entire country, and all of its resources, has, for the period of the war, been under federal control for the purpose of meeting the conditions imposed by the war.

[14] But the appellant in this case has cited General Order No. 50, made by the Director General of Railroads, as opposing the view that the transportation companies themselves are under federal control. We here quote that order and excerpts from the amendment thereto:

"Whereas by the proclamations dated December 26, 1917, and April 11, 1918, the President took possession and assumed control of systems of transportation and the appurtenances thereof and appointed the undersigned, William G. McAdoo, Director General of Railroads, and provided in and by said proclamations that 'until and except so far as said director shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission and to all statutes, * * * but any orders, general or special, hereafter made by said Director shall have paramount authority and be obeyed as such;' and

"Whereas the act of Congress, called the Federal Control Act, approved March 21, 1918, provided that 'Carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control, or with any order of the President;' and

"Whereas since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits and proceedings hereinafter referred to, based on causes of action arising during or out of federal control should be brought directly against the said Director General of Railroads and not against said corporations:

"It is therefore ordered, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to persons, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit, or proceeding but for federal control might have been brought against the carrier company, shall be brought against William G. McAdoo, Director General of Railroads, and not otherwise; provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures.

"Subject to the provisions of General Orders numbered 18, 18-A and 26, heretofore issued by the Director General of Railroads, service of process in any such action, suit or proceeding may be made upon operating officials operating for the Director General of Railroads, the rail-

road or other carrier in respect of which the cause of action arises in the same way as service was heretofore made upon like operating officials for such railroad or other carrier company.

"The pleadings in all such actions at law, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad or other carrier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom.

"The undersigned Director General of Railroads is acting herein by authority of the President for and on behalf of the United States of America, therefore no supersedeas bond or other security shall be required of the Director General of Railroads in any court for the taking of or in connection with an appeal, writ of error, supersedeas, or other process in law, equity, or in admiralty, as a condition precedent to the prosecution of any such appeal, writ of error, supersedeas, or other process, or otherwise in respect of any such cause of action or proceeding." General Order No. 50.

"General Order No. 50, issued October 28, 1918, is hereby amended to read as follows:

"It is therefore ordered, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit, or proceeding but for federal control might have been brought against the carrier company, shall be brought against the Director General of Railroads, and not otherwise; provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures.

"Subject to the provisions of General Orders numbered 18, 18–A and 26, heretofore issued by the Director General of Railroads, service of process in any such action, suit or proceeding may be made upon operating officials operating for the Director General of Railroads, the railroad or other carrier in respect of which the cause of action arises in the same way as service was heretofore made upon like operating officials for such railroad or other carrier company.

"The pleadings in all such actions at law, suits in equity, or proceedings in admiralty, now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad or other carrier, may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom." General Order No. 50–A.

[15, 16] In view of the express provisions of the act of Congress that, "while under federal control, * * * actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law," etc., and other considera-

tions hereafter to be stated, it is a question of serious doubt whether the making of this order is within the scope of the Director General's authority; but, assuming that it is, his authority is sustainable on no other theory than that the transportation companies themselves are under federal control, and therefore within his jurisdiction. If they are not under his jurisdiction, what authority has he to say that they cannot be sued, and why is it necessary for him to so say? If the transportation companies have no connection with the operation of the railroads, this fact is a complete defense to any action against them, and this order is wholly futile. Moreover, if the transportation companies are under federal control, the Director General is without authority to interfere with the orderly administration of justice or to set aside the ordinary and usual course of procedure in courts of justice according to the course of the common law and deny to a plaintiff the right to pursue his ordinary legal remedy against one who, he alleges, has transgressed or violated his rights. Such a proceeding as authorized by this general order would effect an entire change of parties, and, after a plaintiff has pursued his remedy to judgment, it would not be enforceable. Confessedly the Director General is not personally liable, and there is no statute or authority for binding the government in such a proceeding, and this course would clearly amount to a denial of due process of law in violation of the Constitution, both state and federal. Rul. Cas. Law, pp. 433–446, inc., embracing sections 430–441.

[17, 18] The act of the government in assuming federal control is referable solely to the exercise of military power as a means of meeting the emergencies imposed by a state of war. It can be justified on no other theory, and it is a well-established rule of law that persons engaged in the military service of a nation are not liable in an action for damages for acts done in the course of their military duties in obeying a legal order. Little v. Barreme, 2 Cranch, 170, 2 L. Ed. 243; Luther v. Borden, 7 How. 1, 12 L. Ed. 581; Mitchell v. Harmony, 13 How. 115, 14 L. Ed. 75; Bean v. Beckwith, 18 Wall. 510, 21 L. Ed. 849; Bates v. Clark, 95 U. S. 204, 24 L. Ed. 471; Dow v. Johnson, 100 U. S. 158, 25 L. Ed. 632; 18 Rl. Cas. Law, p. 1082, par. 75.

[19, 20] And likewise, that the government is not liable to be sued for the tortious conduct, misfeasance or laches of its officers or employés, unless its consent thereto is given by some act of Congress. Bigby v. United States, 188 U. S. 400, 23 Sup. Ct. 468, 47 L. Ed. 519; Stanley v. Schwalby, 162 U. S. 255, 16 Sup. Ct. 754, 40 L. Ed. 960. And this rule of immunity of the government from being sued prevents the substitution of an

officer of the government as a party where the purpose of the suit affects the right or determines the liability of the government. Oregon v. Hitchcock, 202 U. S. 60, 26 Sup. Ct. 568, 50 L. Ed. 935; Naganab v. Hitchcock, 202 U. S. 473, 26 Sup. Ct. 667, 50 L. Ed. 1113; Louisiana v, McAdoo, 234 U. S. 627, 34 Sup. Ct. 938, 58 L. Ed. 1506.

[21] The apparent theory of General Order No. 50 is that, while the carriers are operating 'under ' federal control, they are mere agents of the government, and, if liability for their torts and the torts of their employés exists, it is against the government and not the carrier, and therefore actions for such torts should be against the Director General of Railroads and not against the carrier. It is only on this theory that the Director General would have even colorable authority to interfere with a suit against a transportation. company, and this theory undoubtedly conflicts with the principles above stated. The only authority for suing a carrier while under federal control must be rested upon the act of Congress which subjects them "to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law," with certain exceptions, and provides that—

"Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law," etc. U. S. Comp. Stat. 1918, pp. 456–458.

And the validity of this statute is sustainable on no other theory than that the transportation companies are operating their respective systems under federal control. If such companies are in no way connected with the operation of their respective transportation systems, we submit that it would not be within the power of Congress to subject them to liability and suits thereon for the torts, miscarriages, and defaults of the employés of the federal government. Such an act would be an arbitrary exercise of legislative power contrary to the established principles of private rights and distributive justice and tantamount to a denial of due process of law. Zeigler v. S. & N. A. R. R Co., 58 Ala. 594; Mobile Light & R. R. Co. v. Copeland & Sons, 15 Ala. App. 235, 73 South. 131; Bank of Columbia v. Okley, 4 Wheat. 235, 4 L. Ed. 559; Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. 111, 292, 28 L. Ed. 232; Dent v. West Virginia, 129 U. S. 114, 9 Sup. Ct. 231, 32 L. Ed. 623; Leeper v. Texas, 139 U. S. 462, 11 Sup. Ct. 577, 35 L. Ed. 225; Giozza v. Tiernan, 148 U. S. 657, 13 Sup. Ct. 721, 37 L. Ed. 599; Jones v. Brim, 165 U. S. 180, 17 Sup. Ct. 282, 41 L. Ed. 677; Maxwell v. Dow, 176 U. S. 581, 20 Sup. Ct. 448, 494,. 44 L. Ed. 597; 6 Rul. Cas. Law, pp. 433–446, embracing paragraphs 430 to 442, on Constitutional Law.

On the other hand, if the carriers are operating under federal control and are agencies of. the government, the authority of Congress to impose liability on the carriers for the torts of their employés is clearly sustainable on the theory that such responsibility encourages caution on the part of the carriers and their employés promotes efficiency, and safeguards the interests of the government and the general public.

There is no proof in this case that the railroad administration, in the exercise of federal control, has excluded the transportation companies from the exercise of their functions in the operation of their respective systems, and we cannot assume that it has done so contrary to the manifest purpose and spirit of the authority conferred by the act of Congress, and the proclamations of the President.

The foregoing considerations lead us to hold that the Louisville & Nashville Railroad Company is under federal control and is exercising its functions and operating its system as an agency of the government and as such was bailee of the property alleged to have been stolen, and the ownership thereof was properly laid. This disposes of all questions presented by the record, and, find-. ing no error therein, the judgment will be' affirmed.

Affirmed.