# Illinois Central Railroad Company

### *v.*

## William Ashmead.

1. CARRIERS—*when their liability attaches, and herein, of the effect of military restraint.* Where a railroad company, in the unrestrained exercise of its franchises, consents to the delivery of freight in its cars or warehouse for immediate shipment, upon such delivery the liability of the company, as a common carrier, at once attaches, and it is held responsible for any loss growing out of any neglect of the duties incident thereto.

2. And even where it is not in the free exercise of its franchises, and receives property for transportation, and gives the ordinary shipping receipt without limiting its liability or undertaking, it would still be liable, notwithstanding military or other control. In such a case, it must be presumed the company knew whether it could, nevertheless, act as a common carrier, and on what terms, also whether it had the necessary permission or orders for the purpose from the military authorities, or other controlling power. It is held, in such case, to a performance of the duty according to the terms on which it was undertaken.

3. When, however, the road is under the absolute control of the general government, and in its possession, the same presumption can not be indulged that obtains if it is under the entire and free management of the company.

4. CARRIERS—*warehousemen—in which capacity liable.* In an action against the Illinois Central Railroad Company, to recover damages occasioned to the plaintiff by reason of the alleged neglect on the part of the defendant to perform its duty as a common carrier, in that it had failed to transport, in proper time, from Macon station to the city of Cairo, a quantity of corn, placed by the plaintiff, in the month of March, 1865, in the cars and warehouse of the company at the former place for shipment to the latter, whereby the corn became mouldy and greatly damaged, it appeared that previous to that time the general government had taken military possession of the road, with direction that its whole force should be used for government purposes, if necessary, and though its operation was continued by the officers and employees of the company, yet it could not ship corn to Cairo for private parties, unless by permission of the military authorities, the general freight agent having received a military order not to ship corn to that place unless specially directed, and which order he had communicated to the freight agent at Macon station, as well as to all others on the road. There was no shipping receipt given to the plaintiff, nor was there any other evidence of a contract to carry the corn: *Held*, the mere fact that the plaintiff had delivered the corn in the cars and warehouse of the

company, with the permission of the agent, did not create, under the circumstances, the relation of shipper and common carrier between him and the company. The company, in such case, could only be held bound to the duties of that relation by contract, and *without such a contract to remove the presumption* that the company could only carry the corn by permission of the military authorities, or that it had the necessary permission, such delivery could only be considered as a storage by the plaintiff until such time as permission could be obtained to forward the corn.

5. Though, had the company given a shipping receipt in the usual form, it would have been liable as a common carrier, whether or not it appeared the necessary permission to carry the corn was obtained.

6. The plaintiff in this case having a warehouse of his own at Macon station, must have known the road was under military control, and knowing that fact, it devolved on him, when he so delivered the corn, equally with the company, to obtain permission to have it shipped.

7. Upon its being urged that favoritism was shown to a class of shippers, or to particular individuals, it was *held*, that could not affect the liability of the company, if it was acting under, and only in pursuance of, the orders of the military authorities.

APPEAL from the Circuit Court of DeWitt county; the Hon. JOHN M. SCOTT, Judge, presiding.

Mr. GEORGE TRUMBULL, Mr. CHARLES EMERSON, and Messrs. WILLIAMS & BURR, for the appellant.

Messrs. POST & BUCKINGHAM, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

Regarding this case of more importance than usual, independent of the amount involved, on the application for a rehearing, it was deemed proper to have it again considered, that the full bench, as at present organized, might review the grounds upon which the former decision was based. Having carefully considered the evidence and legal propositions involved, we have been constrained to arrive at the same conclusions, and for the same reasons.

Some time about the last of March, 1865, appellee placed in the cars of the railroad company, at their station at Macon, somewhere near 2,800 bushels of corn. Whether this was with the consent of the freight agent, does not appear. It was

in sacks, and had been sold to John G. Hornberger, and was to be delivered to him at Cairo, subject to inspection at that place ; but Hornberger having refused to pay for the corn when thus placed on the cars, it was agreed by him and appellee that it should be shipped to Cairo and sold, and appellee should account to Hornberger for all it might bring over $1.05, the contract price. The corn remained in the cars about six weeks, without being sent forward, and becoming mouldy and spoiled, and the sacks rotten, appellee took it from the cars. He also stored in the warehouse of the company about 2,200 bushels. Cars were not furnished in which to place this latter lot, but it was simply stored in the warehouse with the assent of the agent of the company. It likewise moulded, and appellee removed it with that placed in the cars, sold a part for $130, and fed a portion to stock, and the remainder was abandoned as worthless.

The evidence shows, that the general government had some time previously taken military possession of this and other roads, but its operation was continued by the officers and employees of the company, and it could not ship corn to Cairo unless it was by the permission of the military authorities. Special orders were given to the general freight agent not to ship corn to that point, in March, 1865, unless he was specially directed, and he, in consequence of such orders, gave similar directions to the freight agent at Macon station, as well as to all others on the road.

Appellee contends, that the mere delivery of the grain in the cars and warehouse of the company, of itself, created the relation of shipper and common carrier between him and the company, and that all the duties and liabilities of the relation attached to the company, and failing to transport the corn to Cairo, where it was intended to be shipped, was such carelessness or neglect of duty as rendered the company liable to make good to him all loss occasioned by the spoiling of the grain. But appellants insist, that the general government having taken possession and control of the road, the company, by

merely permitting appellee to store his grain in their cars and warehouse, until leave was given to send the grain forward, can not be held to have assumed the liability of common carriers, and having been guilty of no wrong or neglect of duty, the loss should be borne by appellee.

If the company were free to act, and were in the unrestrained exercise of their franchises, then no one could question, that by delivering grain in their cars or warehouse, by the consent of their agent, for immediate shipment, they would at once become liable as common carriers. And any loss growing out of the neglect of the duties which attach, would render them liable. Or, even when they are not in the free exercise of their franchises, and they receive property .for transportation, and give ordinary shipping receipts, without limiting their liability or undertaking, there is no doubt they would still be liable, notwithstanding military or other control. In such a case, they must be presumed to know whether they may, nevertheless, act as common carriers, and on what terms. Also, whether they have the necessary permission or orders for the purpose, and when they undertake the duty, they will be held to its performance according to the terms on which it was undertaken.

When, however, the company were under the absolute control of the general government, and in its possession, we can not indulge the same presumptions that should obtain if it was under the entire and free management of the company. They were bound to submit to the superior power of the government, and when they did, the general public had no right to insist upon duties to them, which the company, without fault on their part, were rendered unable to perform. When the government took control of the road, the power to exercise freely the franchises of the company, ceased. If the military power had the control of this road, and directed the manner in which it should be operated, and the company had no power to exercise their franchises for the benefit of the general public, upon what principle can it be maintained that

they should nevertheless be held to the performance of the duties of common carriers, which they were prohibited by the army officers having charge of the road, from exercising? If, as the general freight agent swears, they had orders at that time not to ship corn to Cairo without permission from the army officers, who should the company obey, such officers, or a private citizen claiming the right to have his grain thus shipped, in defiance of such orders?

Had this military order been disobeyed by the company, does any one suppose that the officers and employees of the road would have been permitted to operate it? On the contrary, is it not morally certain that the military authorities, having charge of the road, would have at once removed all or at least a sufficient number of the employees to have secured obedience to their orders? If, then, the company were thus restrained in the performance of the duties of carriers, and they did not so contract as to assume such duties to appellee, they should not be held liable.

Did they contract to carry? This record is barren of all evidence to prove they did. Appellee only states, that he placed the grain in the cars and the warehouse, part with and part without the permission of the agent of the company. If it was to be shipped, he does not state when or on what terms. If it was only stored until rolling stock and an order from the military authorities could be obtained, then the liabilities of common carriers did not attach. The evidence fails to show a contract to ship. No receipt was taken from which we can determine whether received as warehousemen or as common carriers. And we have seen, that when placed under military control, and being unable to ship corn without military orders, we can not hold that the usual duties of carriers attached, merely from placing the grain in the cars and warehouse of the company, but to have that effect it must be by contract. No such contract is proved to remove the presumption, that the company were still compelled to obey military orders. If there was such a contract, why not prove it?

It is urged that this case is governed by the case of the *Illinois Central Railroad* v. *McClellan*, 54 Ill. 58. In that case the company gave a shipping receipt in the usual form, without limiting their liability, and the military authorities had given express permission to ship the corn, but the company failed to perform the duty in a reasonable time, by reason of which the grain was injured, and the company held liable for the loss. In that case they attempted to escape liability on the ground, that it would have been an useless act to have sooner sent it to Cairo, as the track and warehouses at that point were so far obstructed that it could not have been sooner inspected and disposed of than it was, but it was held, that did not constitute a defense; that if they had desired to guard against such contingencies, they should have provided for it in the shipping receipt. In this case no such receipt was given, nor does it appear that permission was obtained to ship the grain, but, on the contrary, orders had been received by the general freight agent not to ship corn to Cairo, and this had been communicated by him to his subordinates. In this is the broad distinction between the two cases. Had a shipping receipt, in the usual form, been given for this grain, and permission to ship it obtained from the military officers, then the two cases would have been similar in principle.

The order placing this road under military control directs, that government troops and munitions of war, ordered by the military authorities, should be transported to the exclusion of all other business. And the order of the chief quartermaster, on the 11th of January, 1864, declares, that the full force of all railroads leading from the source of supplies is required, and this road is specifically named, and directs that government freight shall be carried thereon to the exclusion of all private property if necessary, and that whatever supplies government had or might thereafter contract for, should take precedence of private freight. Had the full capacity of the road not been required by the government, then the excess of

their capacity above that required, if permitted, could have been employed in carrying private freight, and to that extent they would have been common carriers.    And had the company given a shipping receipt in the usual form, the presumption would then have arisen, that the government was not using the road to its full capacity, and the company was contracting as ordinary common carriers, even without special orders as in McClellan's case.

Appellee had a warehouse at Macon Station, and he must have known that the road was under military control.    And knowing that fact it devolved on him, equally with the company, to obtain permission to have his grain shipped.    If he knew that it required an order from the quartermaster, either directly or through the general superintendent, it must be presumed he only stored the corn until the necessary order could be obtained.    It has been urged, that favoritism was shown to a class of shippers or to particular individuals. This could not affect the company, if they were acting under and only in pursuance of the orders of the quartermaster.    They were not responsible for the acts of the army officers, whose orders they were compelled to obey.    We can not presume that after receiving orders not to ship corn to Cairo, they would assume the responsibility of common carriers, until the restriction was removed, and there is no evidence that it had been.    Then how can we infer such an intention from the mere delivery of the grain in their cars and warehouse?    But for the reasons given, the judgment of the court below is reversed and the cause remanded.

*Judgment reversed.*

Mr. Justice Scott took no part in the decision of this case.