KNEELAND-BIGELOW CO. *v.* MICHIGAN CENTRAL
RAILROAD CO.

1. EVIDENCE — JUDICIAL NOTICE — STATE OF WAR — OPERATION OF
RAILROADS BY GOVERNMENT.

Judicial notice may be taken by the courts that a state of
war exists, and that congress has placed in the hands
of the government the direction and operation of the rail-
roads of the country during such emergency.

2. WAR—GOVERNMENTAL DETERMINATION—BINDING UPON COURTS.

The existence of war and restoration of peace are deter-
mined by action of the legislative, supplemented by the
executive, department of government, and such determi-
nation is binding upon the courts.

3. SAME—DURATION OF WARFARE.

War having been declared, that condition must be recog-
nized by the courts as existent until the duly constituted
national power of the country officially declares to the
contrary, even though actual warfare has long since
ceased.

4. SAME—OPERATION OF RAILROADS BY GOVERNMENT—POWERS.

The government, in exercising its war-time power, *vis major,*
or the greatest power of all, in taking over the railroads
of the country and directing and operating them, has the
power to initiate and change rates, fares, charges, etc.,
when the public interest requires, beyond any resistance
by those against whom it is directed (39 U. S. Stat. chap.
418, p. 645; 40 U. S. Stat. chap. 25, p. 456).

5. SAME—RAILROADS—GOVERNMENTAL AGENCY.

A railroad company, whose property has been so taken over
by the government as a war measure, is but a subordinate
governmental agency, serving under direction and at the
will of the government.

6. SAME—CONTRACTS AS AFFECTED BY WAR.

The existence of a state of war affects different contracts in
different ways: Some are avoided or dissolved, others are
rendered unenforceable for the time being, others, again,
remain unaffected; the particular condition of each con-
tract materially affecting the consideration of each case.

7. RAILROADS—CONTRACTS—SPECIFIC PERFORMANCE—OPERATION BY GOVERNMENT AS WAR MEASURE—STATE COURTS—JURISDICTION.

The State courts will not entertain jurisdiction to compel the specific performance of a pre-war contract between plaintiff, a logging company, and defendant, a railroad company, for hauling logs at a specified rate, during the time said railroad is operated by the government under its war time powers; said defendant having been ousted and incapable of performing.

8. SAME—BREACH OF CONTRACT—REMEDIES.

The validity of the contract, defendant's liability for damages by reason of its breach, or duty to continue performance should changed conditions render such course possible, and plaintiffs' rights in an action at law or in some other appropriate proceeding, are passed without prejudice and not determined.

Appeal from Bay; Houghton, J. Submitted June 6, 1919. (Docket No. 78.) Decided November 11, 1919.

Bill by the Kneeland-Bigelow Company and another against the Michigan Central Railroad Company and another for a temporary injunction and the specific performance of a contract. From a decree dismissing the bill for want of jurisdiction, plaintiffs appeal. Affirmed.

*Beaumont, Smith & Harris,* for plaintiffs.

*Frank E. Robson,* for defendant railroad company.

STEERE, J. This matter was heard in the circuit court of Bay county, in chancery, on a motion of plaintiffs for preliminary injunction to restrain a claimed excessive rate charge for transportation of logs, together with a motion of the Michigan railroad commission to dismiss plaintiffs' bill as to it and a motion of the Michigan Central Railroad Company for dismissal of said bill on grounds set forth in its answer then on file. The motions were argued and submitted

together. Plaintiffs appeal from a decree dismissing their bill of complaint on the ground that the court was without jurisdiction to grant the relief asked.

The original bill of complaint was filed May 15, 1918. On May 22, 1918, motion for a preliminary injunction and an amended bill were served, the latter being practically the same in form and matter as the original and accompanied by certain exhibits referred to therein. The motion by defendant Michigan railroad commission to dismiss was served May 22, 1918. The defendant railroad company filed its answer on July 15, 1918, with motion to dismiss. The grounds stated in its answer and pressed in the motion to dismiss which present the controlling issues involved, as we view them, are that plaintiffs have an adequate remedy at law, if any, and—

"all jurisdiction by this court over the property of this defendant and all equipment thereof, appurtenances thereto and the operation thereof, and charges for the transportation of freight thereon, so far as pertains to the complaints alleged in said bill of complaint, and the relief therein prayed for, has been ousted by said act of congress of August 29, 1916, the proclamation of the President of the United States pursuant thereto, and the act of congress entitled 'An act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes,' approved March 21, 1918, and the action of the President and director general thereunder, as set forth in director general's Order No. 28, and supplement thereto."

The relief sought by plaintiffs' bill is specific performance by the Michigan Central Railroad Company of a pre-war contract according to its terms, their immediate grievance being the imposition of a haulage rate in excess of that provided in said contract which the court is asked to eliminate by injunction.

While previous contract relations between the parties are detailed at length as a basis for plaintiffs' various contentions in support of the validity and present enforceability of the contract immediately involved, as more directly in point and contemporaneous with the matter complained of, it appears that for several years prior and up to the time when the Federal government took over possession and control of the Michigan Central Railroad as a war measure said railroad company and plaintiffs were in mutual performance of a written contract entered into September 15, 1911, which, with numerous recitals, descriptions and conditions not necessary to detail, provided that plaintiffs would deliver from their lumbering operations on lands in northern Michigan 12,500,000 feet of logs per annum to said railroad company for transportation to Bay City during the ensuing period of 20 years, and the latter would receive, furnish cars therefor and transport the same over its line to said destination during said period, charging therefor a basic rate, with immaterial variations, of $2.25 per thousand feet. Before the time answer was filed herein and the motions, noticed for July 1, 1918, had been heard this rate had been increased 40% by two advances, the first of 15% becoming operative April 15th and the second of 25% effective June 25, 1918.

Section 1 of an act of congress of August 29, 1916, making appropriation for the support of the United States army, and for other purposes (39 U. S. Stat. chap. 418, p. 645, 9 Fed. Stat. Ann. [2d Ed.] p. 1095), provides in part as follows:

"The President, in time of war, is empowered, through the secretary of war, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion so far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other

purposes connected with the emergency as may be needful or desirable."

On December 26, 1917, the President of the United States issued a proclamation that by joint resolutions of congress a state of war existed between the United States of America and Germany and Austria, that it had become necessary in the national defense to take possession and assume control of certain transportation systems under the act above quoted from, proclaiming that—

"under and by virtue of the powers vested in me by the foregoing resolutions and statute, and by virtue of all other powers thereto me enabling, do hereby, through Newton D. Baker, secretary of war, take possession and assume control at 12 o'clock noon on the twenty-eighth day of December, 1917, of each and every system of transportation and the appurtenances thereof located wholly or in part within the boundaries of the continental United States and consisting of railroads," etc.

—and directed that possession, control, operation and utilization of such transportation systems be exercised through and by William G. McAdoo, appointed director general of railroads. (Official Bulletin December 27, 1917.) Said proclamation at some length declared the duties imposed and authority given to said director general, provided that until and except so far as from time to time otherwise by general or special orders directed and determined by him such systems should remain subject to existing laws, statutes and orders of the interstate commerce commission and to statutes and orders of regulating commissions of the various States in which said railroad systems or any part thereof should be situated, but that "any orders, general or special, hereafter made by said director general shall have paramount authority and be obeyed as such."

Following this an act of congress was passed, on March 21, 1918, entitled: "An act to provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes" (40 U. S. Stat. chap. 25, p. 456, Supp. Fed. Stat. Ann. [2d Ed.] p. 757), which provided in section 10, among other things:

"That during the period of Federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, * * * That when the President shall find and certify to the interstate commerce commission that in order to defray the expenses of Federal control, and operation fairly chargeable to railway operating expenses, and also to pay railway tax accruals other than war taxes, net rents for joint facilities and equipment, and compensation to the carriers, operating as a unit, it is necessary to increase the railway operating revenues, the interstate commerce commission in determining the justness and reasonableness of any rate, fare, charge, classification, regulation, or practice shall take into consideration said finding and certificate by the President, together with such recommendation as he may make."

Under the terms of this act and for its efficient execution the President issued a further proclamation on March 29, 1918, continuing Mr. McAdoo in authority as director general and authorizing him—

"to issue any and all orders which may in any way be found necessary and expedient in connection with the Federal control of systems of transportation, railroads, and inland waterways, as fully in all respects as the President is authorized to do, and generally to do and perform all and singular all acts and things and to exercise all and singular the powers and duties which in and by the said act, or any other act in relation to the subject hereof, the President is authorized to do and perform."

The 15% increase in rates was made while the railroads were in possession of the government and under

Federal control, pursuant to acts of congress and proclamations of the President above referred to. _ No direct order of the director general is shown as to it, but rate tariffs were then published and filed with the Michigan railroad commission in compliance with the State law upon that subject (2 Comp. Laws 1915, § 8109 *et seq.*), providing, amongst other things, for a 15% advance in the rate on logs effective April 15, 1918. Plaintiffs, and others, then applied unsuccessfully to the State railroad commission under the State law for an order suspending or changing such tariff.

On May 25, 1918, Director General McAdoo issued General Order No. 28 by which the then existing rate was advanced 25%, expressly finding therein and certifying to the interstate commerce commission, in part:

"That in order to defray the expenses of Federal control and operation fairly chargeable to railway operating expenses, and also to pay railway tax accruals other than war taxes, net rents for joint facilities and equipment, and compensation to the carriers, operating as a unit, it is necessary to increase the railway operating revenues, and, * * * the public interest required that a general advance in all freight rates, passenger fares, and baggage charges on all traffic carried by railroad and steamboat lines taken under Federal control under an act of congress approved August 29, 1916, entitled 'An act for making appropriations for the support of the army for the fiscal year ending June thirtieth, nineteen hundred and seventeen, and for other purposes,' shall be made by initiating the necessary rates, fares, charges, classifications, regulations, and practices by filing the same with the interstate commerce commission under authority of an act of congress approved March 21, 1918." * * *

The basic rate upon which this 25% increase was authorized by Order No. 28 was the filed and published tariff rate then in effect and applicable to the public generally. The rates established and put in force by

General Order No. 28 were initiated and authorized by proclamation of the President under and by authority of congressional legislation enacted as a war measure, in the exercise of a recognized paramount governmental power when a state of war exists. That the governmental power is ample in such emergency and Federal authority plenary under the exigencies shown by the presidential findings and proclamations, is not open to controversy. *United States* v. *Russell,* 13 Wall. (U. S.) 623. Judicial notice may be taken by the courts of such extraordinary conditions. *The Kaiser Wilhelm II,* 246 Fed. 786, 159 C. C. A. 88; *Marshall* v. *Bush,* 102 Neb. 279 (167 N. W. 59).

In the legislative branch of the government congress passed resolutions declaratory of war and laws for the efficient conduct of the same, while the President as chief executive of the nation issued authorized proclamations and orders deemed by him essential to the execution of such laws. Within the scope of those two sovereign departments of our government, the action of congress in passing laws and of the executive in their administration are not to be questioned by the judicial department, Federal or State. The existence of war and restoration of peace are determined by action of the legislative, supplemented by the executive, department of government. Such determination is conclusive and binding upon the courts. War having been declared, that condition must be recognized by the courts as existent until the duly constituted national power of the country officially declares to the contrary, even though actual warfare has long since ceased. *Perkins* v. *Rogers,* 35 Ind. 124, 167.

"The existence of a state of war affects different contracts in different ways. Some contracts are avoided or dissolved; others are rendered unenforceable for the time being; others, again, remain unaffected. The particular condition of each contract materially affects

the consideration of each case." Trotter on Contract During and After War (3d Ed.), p. 7.

This is a pre-war contract partially executed and in course of performance by both parties at the beginning of and during the war until government interference by requisition intervened to deprive the defendant company of the independent power to perform on its part.

This case presents a peculiar if not exceptional situation in the particular that the contract was at the time of hearing in undisturbed physical performance with every indication of continuance, as to the manner and conduct of which plaintiffs offer no complaint. Their sole grievance is that as a condition of its continued performance they are compelled to pay a haulage price 40% in excess of that contracted for, not to the defendant company or its agent, as is clearly shown, but to the Federal government which has taken over the railroad as such in its physical entirety, and has been since December 28, 1917, through the President and his subordinates acting under authority of Federal legislation, in possession and control of defendant's entire system of transportation with all its property and appliances therefor or relating thereto, and is operating said system of transportation under direction and control of the President, who is authorized to initiate and change rates, fares, charges, etc., when in his opinion the public interest requires, while defendant company's connection therewith is but as a subordinate governmental agency serving under direction and at the will of the government. The defendant company has been ousted from possession and control of its entire transportation system by governmental interference, in the exercise of that war time, paramount and irresistible power of government sometimes termed *vis major*, or the greatest power of all, beyond any resistance by those against whom it is

directed.  *Metropolitan Water Board* v. *Dick, Kerr & Co.* (1918), L. R. App. Cas. 119.

Since this contract was entered into in 1911 a grave change of conditions for which neither contracting party is responsible and neither anticipated has imposed upon the defendant company impossibility of further performance on its part, whether temporarily or permanently we need not inquire; while on plaintiffs' part the existence of a state of war with resultant governmental interference in taking possession and control of defendant's transportation system has only affected them by advanced traffic rates.  This they seek relief from in a court of chancery under a bill for specific performance against a defendant deprived of power to perform by the Federal government, which is in absolute control of the transportation system essential to performance and with it fulfilling the contract, except as to the matter of rates, while none of its officials in control and imposing the conditions complained of are parties to the suit.  Under such conditions a decree of specific performance against the party ousted and incapable of performing would seem to be a vain thing.

For disposition of the issue directly involved we deem it sufficient to find and hold that, by a war measure interposition of the sovereign governmental power, this contract was rendered unenforceable, for the time being at least, and so long as such interposition is maintained by *vis major.*

Back of this proposition counsel present and ably argue in their briefs numerous interesting questions, both new and old, bearing upon the validity of the contract, which we do not find it necessary to discuss or pass upon.  Whether this contract is valid or invalid is immaterial here in our view of the case, which turns on the duty and power of the court to enforce the specific performance, or injunctive relief asked

against defendants under the conditions shown by this record. The validity of the contract, defendant's liability for damages by reason of its breach, or duty to continue performance should changed conditions render such course possible, and plaintiffs' present rights in an action at law or in some other appropriate proceeding, are passed without prejudice and not determined. For the reasons stated plaintiffs' bill cannot be entertained at this time under the conditions shown.

The decree dismissing plaintiffs' bill is affirmed, with costs to defendants.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.