### YORK & FENDERSON v. JEFFREYS & SONS.

(Filed 16 November, 1921.)

**Vendor and Purchaser — Contracts — Railroads — War — Stipulations. Against Damages for Delayed Shipments.**

Where there was a stipulation in a written contract of sale of seed potatoes made during governmental control of railroads as a war measure, that the vendor would not be "liable, or responsible" for delays in the delivery of the shipment for causes beyond his control, and it appears. that the shipment was delivered beyond the time agreed upon and to a different line of carriage, but solely caused by war conditions, and the necessities of the Government in the prosecution of the war, the purchaser in the vendor's action to recover the purchase price may not avoid liability therefor by having refused to accept the shipment, the provision of the contract in plaintiff's favor being reasonable, nor can he successfully contend that the shipment having been made by the plaintiff under "an order notify" bill of lading attached to draft, even though as a matter of law it reserved the title in him, made the carrier liable to the plaintiff, and not the defendant.

Appeal by defendant from *Lyon, J.,* at the January Term, 1921, of Wayne.

During the month of January, 1918, Messrs. Maley & Carolin, brokers, of New York, negotiated a contract between the plaintiff and defendant as follows:

"Agreement between York & Fenderson of Mars Hill, Me., and Jeffries & Sons, Goldsboro, N. C., as to one car of potatoes, as follows: 150 10-peck sacks Red Bliss seed potatoes, balance of car consisting of about 150 sacks seed Cobblers at the following prices: three dollars and fifty cents per cwt. for the Red Bliss and three dollars and ten cents per cwt. for the Cobblers, shipment to be made about the first of February and delivered Goldsboro, N. C., at above mentioned prices. The said Jeffries & Sons agree to pay $3.50 per cwt. for the Red Bliss and $3.10 per cwt. for the Cobblers in the following manner: Amount draft and bill lading attached. ·

"It is further agreed that the said York & Fenderson will load and ship the potatoes, using all possible means available to get them out on time, but will not be held liable or responsible for delays occasioned by the railroads being unable to furnish cars for the transportation of said potatoes or for other delays over which said York & Fenderson have no control.

"In witness whereof, the parties hereto have hereunto subscribed their names the day and year above written.

"YORK & FENDERSON,
JEFFREYS & SONS."

The above contract is dated 23 January, 1918, but was not forwarded to the defendant until 31 January, 1918, as will appear by letter. The contract was thereupon returned to Maley & Carolin, brokers, by the defendant, and on 4 February, 1918, mailed to this plaintiff by said Maley & Carolin. While it is true that the contract provides for shipment about 1 February, it is admitted by the defendant Z. M. L. Jeffreys that he did not actually sign the contract until 1 February, at which time he attached thereto an additional order for 200 bags of Cobblers to be shipped in the same car. He knew at the time that the contract was to be mailed from Goldsboro, N. C., to Maley & Carolin, New York City, thence by Maley & Carolin to these plaintiffs at Mars Hill, Maine, and the defendant Z. M. L. Jeffreys further admitted that plaintiff could not possibly have shipped any potatoes under this contract, even if there had been no embargoes, before 6 or 7 February.

Immediately upon receipt of the contract, plaintiff wrote to the defendants that their favor of the 30th to Maley & Carolin had been forwarded to them for attention, and, in reply, they begged to advise that just at that time there was an embargo on the M. & M. T. Company from Boston to Norfolk, and as this was the route that their shipment

had to take, they were unable to move it just then, besides the weather was extremely cold and plaintiff did not believe that defendant would want them moved under such conditions. That plaintiff had the matter before them and would move defendant's car just as soon as conditions would permit, which they trusted would be satisfactory, and that the potatoes would reach defendant in plenty of time for their requirements. To the above letter the defendant made no reply.

On 15 February, the plaintiff, in accordance with said contract, shipped to the defendant one carload of potatoes and advised the defendant by letter of same date, in substance as follows:

"We hand you herewith the invoice for your first car of potatoes, and are pleased to advise, as you will see, that we were able to get a large car and have given you the 200 bags of Cobblers which you asked for. We used the freight rate as given us by the transportation people, but if there is any difference from what we have allowed, if you will send paid freight bill we will send you check to cover. We trust that the stock will arrive in good season and be satisfactory, as we feel sure it will."

It appears by the undisputed testimony that plaintiff made application for car immediately upon receipt of the contract, and shipped the potatoes in the first available car, and that the potatoes were U. S. grade No. 1. There was delay in transit, and the potatoes did not arrive in Goldsboro until about 23 March, 1918. On 9 March, 1918, and before the potatoes arrived, the defendants wrote the plaintiffs that they had asked the Atlantic Coast Line Railway to trace the car of potatoes (M. C. E., 65030), and had been informed that the car left Boston on Clyde Line via Charleston, S. C., on 4 March. "Why did you ship this car via Clyde Line? It seems to us that we are entitled to damages. Planting season is virtually over with us, and no probability of getting potatoes in some time. We had sold these potatoes before we gave orders for same. All our orders have been canceled. Am satisfied charges will be much more than you deducted."

Again, on 19 March, defendant wrote the plaintiff that should the car of potatoes arrive they would notify plaintiff by wire. That Mr. D. H. Dixon, broker, was a good man to turn them over to. He had handled fifty cars that season. That defendant was turning car down upon the ground that planting season was over and the people they had sold to had bought elsewhere. That defendant had lost their profit, and plaintiff could look to transportation company. And on 23 March, when the potatoes arrived the defendants wired the plaintiff as follows: "We are not going to accept potatoes."

It appears from the evidence that the normal time for delivery of potatoes from Mars Hill, Maine, to Goldsboro, N. C., is fourteen days,

and if the delivery had been made within the usual time the potatoes would have reached Goldsboro in ample time for the planting season. The plaintiffs contend that at the time this contract was entered into both parties knew that the World War was being waged, and both knew that embargoes were frequent, and that delays were the rule rather than the exception, and, under such conditions, it was but natural and prudent that every shipper should safeguard himself against delays by railroads that were engaged primarily and preferentially in the transportation of soldiers. The defendant testified that the potatoes lay on the docks in Boston for three weeks, and that if the potatoes had arrived three weeks earlier they would have been in time for planting season. Examination of the record will disclose that the potatoes were refused because they did not arrive in time for the planting season, and it will appear, and it does appear, that if the potatoes had been transported within the usual time that they would have arrived in ample time for the planting season in eastern North Carolina.

The judge charged the jury as follows: "If you find from this evidence, the burden being on the plaintiff so to satisfy you, that the plaintiffs shipped the potatoes according to its contract, that there was no unreasonable delay in the shipment, and that they shipped by the route that at that time was open and available, and that the delay in the arrival at Goldsboro was no fault on the part of the plaintiffs, why then it would be your duty to answer this issue whatever you may find the amount to be according to the contract. Plaintiffs contend that the amount is $1,508.84." Defendants excepted.

Verdict for plaintiff, assessing damages at $1,508.83. Judgment thereon, and appeal by defendant.

*Langston, Allen & Taylor for plaintiff.*
*Teague & Dees for defendants.*

WALKER, J., after stating the material facts: This is a case of great apparent hardship, as will appear from our recital of the facts, but it is a misfortune which has come to the defendants through no legal fault of the plaintiffs, and therefore must be borne with patience and patriotic resignation, as it was caused by the pressing needs of our Government for immediate and rapid transportation in the movement of men and materials for war purposes. This alone would not exonerate the plaintiffs, but defendants entered into a contract with them which appears in the statement, by which they agreed that the plaintiffs should not be held "liable, *or responsible,*" for any delay, over which they had no control, and occasioned by the railroads being unable to furnish cars, because of prior Government demands upon them to supply transportation for war purposes.

YORK *v.* JEFFREYS.

The defendants asked for two instructions (which were practically identical), to the effect that as the potatoes were shipped, not by open bill of lading, which would have vested the title to them in the defendants, and thereby imposed the risk of delay upon them, but by bill of lading "to their own order, notify Jeffreys & Sons," the risk of any delay was assumed by the plaintiffs, because they retained the title to the potatoes during the course of transportation and until delivery to the defendants upon payment of the draft, which was drawn to order with bill of lading attached. But this view leaves out òf consideration the important and very essential fact that this shipment moved under special contract, excluding the ordinary liability of a shipper by a carrier, and containing a clause therein which protects them from delay in transportation in certain circumstances, which have already been stated. It appears, first, that the defendants agreed that the shipment should be made as it was, that is, "Amount draft and bill of lading attached," and specially stipulated, that the plaintiffs should not be considered in fault, when any delay was caused by conditions and circumstances beyond their control, such as the preferential right of the Government to all means and methods of transportation. The ordinary rules of law do not prevail in such instances, for *inter arma leges silent.* Where the preservation of the Government is at stake, all private rights must give way and be subordinate to it. This is not only the law of war, but the call of patriotism. Ordinarily, the maxim is that "private good yields to public," and the interest of an individual should give place to the public good (*privatum commodum publica cudit*), Jenk. Cent., p. 223, case 80; and the other version of it is that private inconvenience is made up or compensated for by public benefit (*privatum incommodum publico bono pensalur.*) But on another, which is somewhat related to those we have stated, the safety of the people is the supreme law, and as such entitled to the first consideration, and it is the inexorable law that regard be had to the public welfare, and, in times of war and peril, to the public safety, for in such instances an interference with private rights is obviously dictated and justified by the immediate urgency of the occasion and the highest necessity. Broom's Legal Maxims (8 ed.), pp. 2 to 5. The rights and supreme power of the Government in times of war, which may be exercised for its own safety and the protection of its people, must be conceded, and among those rights is the one which permitted it to commandeer the existing means of transportation for its own purposes in prosecuting the war which it had declared against the Central Empires, and to the extent of seizing the railroads or subjecting them to its use and control for war purposes, and the exercise of this power was the reason for inserting the special clause in this contract, exempting the plaintiff from liability or responsibility for delays in transportation

beyond its control. It was a valid stipulation, and must be enforced, and if any losses have been sustained by the defendant because the goods could not be shipped with the usual and customary expedition, by reason of such delays, the defendant must submit to them, for there is no measure of redress, as they came within the class of losses where there is no technical injury, and within the designation of the contract of shipment, that is, "delays beyond plaintiffs' control." If there had been no such provision in the contract, the plaintiff might not have been protected against recovery of damages by the defendant, and perhaps could not have themselves recovered for the price of the potatoes. But the Government, under its war power and the "National Defense Act" of the Congress, had the right to take over all transportation facilities and thereby prevent or obstruct the regular and usual course of carriage by rail and water. If the plaintiff had exempted itself from "liability" only, the result might have been different, but it was relieved from "responsibility" as well, and the parties meant, by the use of this word, something more than mere "liability," or exposure to a suit, or counterclaim for damages. They intended to relieve the plaintiffs of all fault whatever, when the shipment was delayed by an embargo on transportation caused by the necessities of the Government in the exercise of its war powers as authorized by Congress.

This subject is fully discussed in *Roxford Knitting Co. v. Moore and Tierney,* 265 Fed. Rep. (C. C. A.), 177; *Kneeland-Bigelow Co. v. Michigan C. R. Co.,* 207 Mich., 546; *Primos Chemical Co. v. Fulton Steel Corp.,* 266 Fed. Rep., 945; *Bernhardt L. Co. v. Metzloff,* 184 N. Y. Suppl., 289; *Prescott & Co. v. Powles & Co.,* 193 Pac. Rep. (Wash.), 680. The question is also considered in an elaborate note to *Roxford Knitting Mill v. Moore & Tierney, supra,* as reported in 2 Am. L. Rep., Anno., at p. 1429, to which we refer. It was held in *Chemical Co. v. Steel Corp., supra,* that a vendor of a crane, to be manufactured under a contract calling for delivery at a specified time, and providing that the vendor did not assume liability for loss from any cause beyond its control, was held not entitled to recover for the crane, which was not delivered at the time agreed, although the delay might have been due to orders before contracted for, as to which priority certificates had been issued by the Government. The Court recognized, however, that such a cause would constitute a defense to an action by the vendee for damage due to the delay. And in *Prescott & Co. v. Powles & Co., supra,* the Court stated that had the vendor been sued for damages for failure to ship the full order, the Government's act might have afforded a defense, but that, having sued on the contract, it was essential to a recovery that a full performance be shown, and that no excuse not provided for in

the contract would justify a recovery where the performance was partial only, save an act of the vendee rendering performance impossible, or a waiver by it.

I forbear to further pursue this part of the discussion, as in this case there is a clause in the contract which, in our opinion, exempts and exonerates the plaintiffs from all blame and required the defendant to pay for the potatoes. They cannot object that the plaintiff retained the title to the potatoes under the terms of the draft and bill of lading annexed, for they deliberately consented to this form of shipment, and their real promise, therefore, was to pay the draft when the potatoes arrived, take up the bill of lading, and receive the potatoes, and even if they had not so promised, the clause of exemption in the contract would require them to do so, as by its terms, and the finding of the jury as to the embargo preventing an earlier delivery, the plaintiffs were in no fault, having delivered the potatoes as soon as they could do so, and the contract exempted them not only from liability, but also from "responsibility," for not delivering before the end of the planting season.

The jury's verdict has disposed of all other questions concerning defendant's liability for the price of the goods, as, for one example, the shipment by the Clyde Line to Charleston, S. C., it appearing that the Merchants and Miners Transportation Line, the usual one, had been closed by the Government to private transportation.

There is no contention, as we understand the case, that the potatoes were of inferior quality when they were delivered to the carrier for shipment, and there does not appear to be any ground upon which to hold the plaintiffs "responsible" for dilatory conduct on their part. There seems to be no negligence legally imputable to them. *Waddell v. Reddick*, 24 N. C., 424.

Whether the defendants have any right over against the carriers, or any one of them, is a question not now pertinent. As to their rights under the contract of purchase and the other facts, not now necessary for us to consider, see *Richardson v. Woodruff*, 178 N. C., 46; *Gwyn v. R. R.*, 85 N. C., 429, where there is a general discussion of the matter.

The other exceptions are either merely formal or devoid of any genuine merit. Upon the whole, we conclude that the case was correctly tried below and the result is in accordance with the relevant and controlling principles of law.

No error.