UNITED STATES RAILROAD ADMINISTRATION v. HILTON
LUMBER COMPANY.

(Filed 4 April, 1923.)

1. **Courts — Instructions—Expression of Opinion—Statutes—Evidence—Appeal and Error.**

Where the evidence upon the trial is permissible of more than one construction or different inferences may be drawn therefrom, peremptory instructions directing a verdict thereon in favor of either party to the controversy is an expression of an opinion thereon by the trial judge, forbidden by our statute, and constitutes reversible error.   C. S., 564.

2. **Same—Government—Railroads—Embargo.**

Where there is evidence tending to show that one authoritative division of the United States Railroad Administration during Government control had laid an embargo on shipments, and there is also evidence that the shipment in question was for Government purposes, and should have, as an exception, been received and shipped by the initial carrier under a special permit of another authoritative division of the administration, with further evidence that the cars had been placed and partially loaded for shipment before the special permit had been recalled:   *Held,* a peremptory instruction in favor of the railroad administration on the issues as to whether it had lawfully refused to receive the shipments tendered, is in contravention of our statute forbidding the trial judge to express his opinion to the jury upon the weight or credibility of the evidence.   C. S., 564.

3. **Government—Railroads—Embargo—Special Shipping Permit—Loading—Transportation.**

The placing of a car in position to be loaded by the shipper under a special permit during an embargo laid thereon during Government control as a war measure, and permitting the shipper partially to load it on the car before the special permit has been recalled, is some evidence that the special permit has been authorized; and the partial loading of the car may be considered as the commencement of the shipment and take it out of the purview of a general order by the Railroad Administration thereafter issued prohibiting such shipments during the continuance of the embargo.

4. **Government—Railroads—Embargo—Loading Cars—Damage.**

Where, under the control of the Government of railroads, as a war measure, a shipper has loaded a car subject to an embargo placed thereon, he may lawfully be required to unload the car at his own expense.

**5. Damages—Diminution—Duty of Party Damaged—Government—Railroads—Election of Remedies.**

Where a shipper has loaded a carload shipment during an embargo placed on shipments during Government control of railroads, and defends the action of the administration to recover demurrage charges, etc., upon the ground that he had the right to ship under a special permit, and alleges a counterclaim for damages, he may not successfully contend that the plaintiff should have unloaded the car and have minimized the damages, when he had forbidden the plaintiff to enter the car and prevented its doing so, having elected to stand upon his initial rights.

**6. War—Railroads—Connecting Carriers.**

Each railroad, under Government control as a war measure, was an integral part of the combined railroads into one system; and where an embargo had been placed in the territory of a connecting carrier, the initial carrier was not required to accept a shipment and transport it to its terminus. *Cotton Mills v. R. R.*, 150 N. C., 614, cited and distinguished.

Appeal by plaintiff and defendant from *Connor, J.,* at December Term, 1921, of New Hanover.

Civil action to recover demurrage, unloading, storage charges, and war taxes incidental thereto on three cars of lumber loaded and tendered by defendant to plaintiff for shipment, same being refused. The defendant in its answer denied liability for said charges, and set up a counterclaim for damages for the wrongful sale and conversion of defendant's lumber on the cars.

There were three carloads of lumber involved in this controversy, but for the purpose of the trial and appeal they were treated as two separate shipments, as two of the cars were placed and loaded on the same date and were claimed to be embraced in permits issued by the Freight Traffic Committee, North Atlantic Ports.

On 18 March, 1918, the defendant having sold to the Government a carload of lumber consigned to Lieutenant-Colonel R. H. Rolfe, Quartermaster Corps, U. S. A., Guenther's Siding, Philadelphia, Pa., was furnished with a placard by the War Department for the movement of said shipment over embargoes, and denominated "Red Balled." Defendant applied to the plaintiff's agent at Wilmington, N. C., and inquired if freight consigned to the United States officer at Guenther's Siding would be accepted and forwarded, as had previously been done, and the defendant, upon being informed that it would, requested the plaintiff's agent to place on the siding at the defendant's mill a car to be loaded and shipped, and this was done.

On 20 March, 1918, the defendant's manager met the yardmaster of the Seaboard Air Line and informed him that the defendant held F. T. C. permits, covering two carloads of lumber, which were about to expire, and asked the yardmaster if he could not furnish two cars to be

R. R. *v.* LUMBER CO.

loaded and transported under said permits. Whereupon, at 5 p. m. that day the plaintiff placed two cars for such loading on the siding at the defendant's mill, and on the morning following the defendant began the loading of the cars, which it completed and tendered bill of lading to the plaintiff on the 22d for said shipment, but these shipments were declined.

The defendant offered evidence that the value of its lumber was $2,463.24. The demurrage and war tax on the three cars was $2,987. The jury found the plaintiff was entitled to storage of $656.89, plus war tax, and interest from 22 September, 1918. The actual cost of unloading, war tax and storage, according to the tariff fixed by the Interstate Commerce Commission, was $3,067. The jury, responding to the issues submitted, found: (1) That the plaintiff lawfully refused to issue bills of lading to defendant on 18 March for the carload of lumber, destination Guenther's Siding, Philadelphia, Pa.; (2) that the plaintiff was entitled to recover no demurrage therefor; (3) that the plaintiff, on 21 March, 1918, lawfully refused to issue bills of lading for the two cars loaded with lumber, destination New York and Brooklyn; (4) that on account thereof the plaintiff was entitled to recover for storage $656.89, plus war tax, and interest from 22 September, 1918, and (5) that the defendant is entitled to recover of the plaintiff on account of the lumber loaded on said cars and sold by the plaintiff, $2,463.24.

The court rendered judgment in favor of the defendant and against the plaintiff, James D. Davis, agent of the U. S. Railroad Administration, in the sum of $2,204.27, with interest from first day of the trial term, being the amount due by the plaintiff after deducting the allowance for storage, interest, and war tax, on the fourth issue.

Both the plaintiff and defendant appealed.

*John D. Bellamy & Sons for plaintiff.*
*E. K. Bryan for defendant.*

STACY, J., after stating the case: The jury found in answer to the first and third issues that the plaintiff lawfully refused to accept the two shipments tendered by the defendant, the one car on 18 March, 1918, for delivery at Guenther's Siding, Philadelphia, and the two cars on 22 March, 1918, for delivery at New York and at Brooklyn. These responses were made under binding instructions from the court, or what amounted to peremptory instructions, for his Honor told the jury that if they believed the evidence and found the facts to be as testified to by the witnesses, they would answer the first and third issues in favor of the plaintiff. We think this charge must be held for error under our practice, which requires a finding by the jury, without expression of opinion from the court (C. S., 564), where the evidence is permissible

R. R. *v.* LUMBER CO.

of more than one construction, or is such that different inferences may be drawn therefrom. *Kinney v. R. R.,* 122 N. C., 965. "Where the testimony is conflicting upon any material point, or more than one inference may be drawn from it, it is the province of the jury to find the facts or to make the deductions." *Avery, J.,* in *Russell v. R. R.,* 118 N. C., 1111.

It is conceded that at the time these shipments were tendered this country was at war with the Imperial German Government; that the railroads over which they were to be carried had been taken over by the Government of the United States, and were being operated by the President, under a Director General of Railroads. *Missouri Pac. R. Co. v. Ault,* 256 U. S., 554. It is further conceded that in order to avoid congestion and accumulation of freight at junction points, and particularly points north of the Virginia gateways, certain embargoes had been laid by the Car Service Section, Division of Transportation, United States Railroad Administration, or under its authority, and that these shipments were prohibited by the terms of said embargoes, unless permitted under certain exceptions and permits issued by proper legal authority.

For the carload of lumber tendered on 18 March, and consigned to Col. R. H. Rolfe, Quartermaster Corps, U. S. A., Guenther's Siding, Philadelphia, Pa., defendant contends that it had been furnished with a placard, denominated "Red Balled," and issued by the War Department, which took precedence in authority over embargoes. W. C. Kendall, witness for the plaintiff, testified that he was manager of the Car Service Section of the Division of Transportation, United States Railroad Administration, and in charge of the issuance of circulars and general regulations concerning embargoes, except the War Department circular. Speaking of this, the witness said: "That (the War Department circular) was known as Order No. 2 of the Director of Inland Transportation of the War Department, U. S. W. D., and is a War Department authority to issue placards that would prevail over embargoes." Defendant contends that its placard, denominated "Red Balled," was issued under authority of this order, and that it was the duty of the plaintiff to honor the same. But there is evidence on the record tending to show that Order No. 2, issued under date of 18 February, 1918, was modified or changed by Order No. 3, issued by the Car Service Section, Division of Transportation, United States Railroad Administration, under date of 25 February, 1918. This latter order, however, was not offered in evidence, though it does appear from Supplement 2 to S. A. L. Embargo 749-1, issued under date of 11 March, 1918, that "carload shipments for account of U. S. War Department may be made in accordance with provisions of C. S. Order No. 3."

There was further evidence tending to show that these red labels or placards were treated and considered as exceptions to embargoes; while L. P. Sneeden, witness for plaintiff, testified that the embargoes in force at that time on the Baltimore & Ohio and the Pennsylvania Railroads, "prohibited our road from accepting these shipments." But the following appears in the embargo laid by the Pennsylvania Railroad: "Carload shipments for account U. S. War Department may be made in accordance with General Notice No. 141, 7 March, 1918, setting forth provisions of Circular C. S. No. 3, issued by the Car Service Section, Division of Transportation, U. S. R. R. Administration." Thus we have a disputed question of fact, or rather a mixed question of law and fact, with the evidence at least equivocal if not contradictory as to whether the defendant's placard, denominated "Red Balled," was in force and subsisting as a valid exception to embargoes at the time the shipment in question was tendered. *U. S. v. Metropolitan Lumber Co.,* 254 Fed., 337. No doubt this point will be clarified or made certain on another hearing.

The evidence is conflicting as to whether the defendant had commenced loading the two cars, intended for shipment to New York and Brooklyn, before the plaintiff's agent notified the defendant, on 21 March, that these cars would not be received for transportation. They had been sent to defendant's yard the day before to be loaded and shipped under "F. T. C. Permits." These permits were issued by the Freight Traffic Committee of New York or for the North Atlantic Ports; said committee having been appointed by the Assistant Director General of Railroads with authority to issue the permits in question. The purpose of issuing these permits, which might be used as exceptions to or in the face of embargoes, was to enable the committee to regulate the flow of traffic into the North Atlantic Ports. The permits were issued to the consignees, who in turn sent them to the shippers to be used by them in tendering shipments to the carriers' local agents at points of origin. *Baltimore Chamber of Commerce v. B. and O. R. R. Co.,* 45 I. C. C. Reports, p. 42. It is in evidence that the plaintiff's agents honored these F. T. C. Permits in large numbers, before and after they refused to accept the cars offered by defendant for shipment. There is also evidence tending to show that some of the railroads, including the Seaboard Air Line, had authority to issue embargoes against shipments tendered with F. T. C. Permits. But it was customary for the eastern railroads under embargoes to honor said permits, except in extreme cases, where it was necessary to embargo all commodities.

On 18 March, 1918, plaintiff's agent at Wilmington, N. C., received the following telegram from C. E. Hix, Superintendent of Transporta-

tion: "Understand Hilton Lumber Company offering at Wilmington several shipments on F. T. C. Permits. Instruct that they be accepted."

Fearing that this might be considered a general rather than a specific instruction, on 19 March, the following telegram was sent to the agent and assistant general freight agent at Wilmington, and also to the superintendent at Hamlet: "Understand Hilton Lumber Company at Wilmington have loaded three cars covered by F. T. C. Permits, via Norfolk, which were tendered 16 March, and also one car for Captain H. B. Hines, Quartermaster, New York. O. K. to accept routed via N. Y. P. & N. However, in future shipments on F. T. C. Permits must not be accepted until handling with this office."

Later, on 21 or 22 March, embargo 886-33 was laid by the Seaboard Air Line against all freight, with certain exceptions, going north of Richmond. According to its own terms: "This embargo applies to Government freight not included in above exceptions, and automatically stops further placement of cars for loading on various permits with the exceptions of those named above. S. A. L. all freight via R. F. & P., Richmond, Va."

Defendant contends that the cars in question are not affected by S. A. L. embargo 886-33, because they had already been placed by plaintiff's agent, and were then in process of being loaded. The embargo on its face "automatically stops further placement of cars for loading on various permits," and hence, it is the contention of the defendant that it could not apply to cars which had previously been placed for loading. Defendant also contends that the telegram of 19 March was not an embargo, but only an instruction to the agents as to how to proceed in the future with respect to honoring F. T. C. Permits. This was not communicated to the defendant, but plaintiff's agent sent the cars in question to defendant's yard after receiving said telegram, and defendant says there is no evidence appearing on the record to show that he exceeded his authority in placing these cars.

In reply to this, plaintiff says there were other and older embargoes (General Order No. C. S. 17, issued 15 January, 1918, effective 21 January, 1918, and Circular No. C. S. 1, issued on 11 February, 1918, by the Car Service Section, Division of Transportation, United States Railroad Administration), which were effective against these shipments, and that the plaintiff was under no obligation to honor F. T. C. Permits in the face of these embargoes.

With our present understanding of these permits, and the purpose they were intended to serve, we would be disposed to accept the plaintiff's view of the matter but for the dispute, arising on the record, as to whether or not the plaintiff, under its practice and dealing with respect to these permits in the face of embargoes, did actually honor the very permits

in question. Defendant says it did. Plaintiff says it did not. This is a question of fact. *Ill. Cent. R. R. v. Ashmead,* 58 Ill., 487.

Defendant contends that the cars had been placed in its yard and actual loading begun before S. A. L. embargo 886-33 was laid. It further says that, according to plaintiff's own testimony, embargoes were not to become effective until twenty-four hours after midnight of the date of issuance; and that, therefore, this embargo was not in force on 22 March when shipment was tendered. H. H. Elliott, witness for plaintiff, testified: "As a general proposition, my understanding is that if an embargo was issued and freight tendered within 24 hours it was the duty of the agent to receive the freight. It was generally understood that cars in the process of loading were to be regarded as being in transit."

On the other hand, it is the contention of the plaintiff that the defendant knew the permits in question could not be honored without first submitting the matter to the Superintendent of Transportation for his approval; and that, at the solicitation of defendant's manager, the cars were placed subject to such approval, with the understanding that defendant, according to its own testimony, was only "taking a shot," or a chance, on having the permits honored. Defendant's manager explains this by saying that, after looking over the embargo file, which was open to public inspection in the office of the Seaboard Air Line at Wilmington, N. C., he was willing to "take a shot," because it seemed perfectly clear to him that said shipments were in order. Plaintiff, in reply, says that such inspection could not prevail over the embargoes, which defendant's manager evidently failed to see, as they were there on file, and further, the telegram of 19 March from the Superintendent of Transportation was specific as to how F. T. C. Permits were to be handled in the future.

Of course, if the defendant were not in position to insist upon these cars being accepted by the plaintiff for shipment, it was the duty of the defendant to unload them. Circular No. C. S. 1, mentioned above, and issued by authority of the Director General of Railroads, provides: "Cars must not be loaded in violation of embargoes. When this is done, agents are not permitted to issue bills of lading, and if cars are not unloaded they will be held at points of origin subject to current demurrage charges until unloaded or until embargo is lifted." On the other hand, if the permits in question had actually been honored and the cars accepted as freight for shipment, the plaintiff was in the wrong in declining to deal with them as such.

But defendant contends that it should not be held liable for demurrage in any event after notice to plaintiff's agent of its refusal to unload the cars; because, defendant says, the duty then devolved upon the plaintiff to minimize its loss by itself having the cars unloaded. *Yowmans v.*

*Hendersonville,* 175 N. C., 574. Ordinarily, the defendant might avail itself of this principle of law, but there is evidence on the record permitting the inference that the defendant would not allow the plaintiff's agent to go upon its premises for the purpose of unloading said cars. If this be the case, it would seem that the defendant should abide by its election to stand upon its initial rights, whatever they were. These, as we have indicated above, must be determined by the jury's finding on the disputed facts. *Elam v. Realty Co.,* 182 N. C., 603; *Shaw v. Greensboro,* 178 N. C., 426.

There is no disposition on the part of the defendant to question the right of the United States Railroad Administration to lay embargoes for the proper conduct of the several systems of transportation while under Federal control. This could hardly be a debatable question, in view of the overshadowing necessity which caused the Government to take over the railroads in 1917, and it is a matter of common knowledge, as shown by the record, that in March, 1918, the Railroad Administration was face to face with acute problems of transportation. *Baltimore Chamber of Commerce v. B. and O. R. R. Co.,* 45 I. C. C. Reports, 40. See, also, opinion of *Walker, J.,* in *York v. Jeffreys,* 182 N. C., 452. Nor is there any suggestion, on the present record, that the embargoes in question were unreasonable, or unjustly discriminatory. Indeed, each side has undertaken to establish the correctness of its position by virtue of authority derived from the same source, to wit, the embargoes on the one hand and exceptions thereto on the other. However, as bearing upon this question, the following authorities may be of service or interest: *U. S. v. Metropolitan Lumber Co.,* 254 Fed., 348; *Penna. R. R. Co. v. Sonman Coal Co.,* 242 U. S., 121; *Penna. R. R. Co. v. Stineman Coal Co.,* 242 U. S., 298; *Penna. R. R. Co. v. Puritan Coal Co.,* 237 U. S., 121; *Hocking Valley R. R. Co. v. U. S.,* 210 Fed., 735; Hutchinson on Carriers, 146.

The principle announced in *Colton Mills v. R. R.,* 150 N. C., 614, to the effect that the initial carrier, in order to relieve itself from liability, must accept goods offered for shipment, where it is able to do so, and tender them to its connecting carrier, even in the face of an embargo laid by the connecting or delivering carrier against the consignee, can have no application to the facts appearing on the instant record. Although each railroad (not the owner company), as an integral part of the whole system then under Federal control, was authorized by the Car Service Section, Division of Transportation, United States Railroad Administration, to lay certain embargoes in order to avoid congestion on its own yards and over its own lines, yet this was but a part of one entire system, and it would be idle to say that embargoes laid by railroads north of the Virginia gateways could have no effect upon the Seaboard Air Line in

accepting freight for delivery into territory of the North Atlantic Ports. *Smith v. A. C. L. R. R. Co.,* 50 I. C. C. Reports, 227. "The Railroad Administration, established by the President in December, 1917, did not exercise its control through supervision of the owner companies, but by means of a Director General, through 'one control, one administration, one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace, for the period provided, the private ownership theretofore existing.' " *Mr. Justice Brandeis* in *Mo. Pac. R. Co. v. Ault,* 256 U. S., 557, citing *Northern P. R. Co. v. North Dakota,* 250 U. S., 135.

The record discloses other exceptions worthy of consideration, but, as they are not likely to arise on another hearing, we shall not consider them now. There must be a new trial of the whole case. Each side will pay its own costs incurred on this appeal, with the right to have the same taxed ultimately against the losing party.

New trial.